# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BRANDON SAMPLE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 06-0715 (PLF) |
| | ) | |
| FEDERAL BUREAU OF PRISONS, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |

## DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Federal Defendants, the Federal Bureau of Prisons ("BOP") and the United States Department of State (the "Department" or the "Department of State"), through undersigned counsel, hereby file their combined Reply to Plaintiffs' Opposition to Defendants' Motion to Dismiss or Alternatively, Motion for Summary Judgment ("MTD/MSJ"), and Opposition to Plaintiffs' Cross-Motion for Summary Judgment ("Cross-MSJ"). As set forth below, and as evident from the attached exhibits and accompanying declarations, dismissal of all claims, with the exception of the Paperwork Reduction Act claim, is warranted in this action, as no genuine issue of material fact remains.

## BACKGROUND

Plaintiffs filed suit, seeking mandamus and injunctive relief, for alleged violations of the First Amendment of the Constitution, the Administrative Procedures Act ("APA"), the Paperwork Reduction Act ("PRA") , and the Freedom of Information Act ("FOIA"). Second Amended Compl. ¶¶ 1, 57. Defendants filed a MTD/MSJ, and requested an order dismissing Counts 1-11 and Count 14 of the Complaint for failure to state a claim or, alternatively, summary

judgment in their favor.  Dkt. Entry No. 39.  In response, Plaintiffs filed a Cross-MSJ on Counts

1-8, 11, and 14 of the Plaintiff's Second Amended Complaint.  The Parties agree that Count Nine

requires no further Court action due to its settlement by the parties.  *See* Dkt. Entry No. 52; Dkt

Entry No. 46-2, Plaintiff's Memorandum in Support of Summary Judgment at 1.   Further,

Plaintiffs concede that Counts 12-13 should be dismissed as moot, contingent upon the

Defendant BOP's  release of the requested electronic records.  *See* Dkt Entry No. 46-2, Plaintiffs'

Mem. at 1.  Lastly, Plaintiffs concede that the Department of State is entitled to summary

judgment on Count 10.  *Id.*  As the Department of State was only named as a Defendant with

respect to Count 10 of the Amended Complaint, and as Plaintiffs concede that there is no genuine

issue of material fact in dispute concerning Count 10, the Department of State should be

dismissed as a Defendant in this case.

Because Count 9 has been dismissed, and because the parties agree that Counts 10, 12

and 13 should be dismissed, there are only ten remaining disputed counts that are subject to the

Court's review.  These claims fall into four categories: (I) alleged Violation of First Amendment

Rights (Count 1); (II) alleged Failure to Comply With the APA (Counts 1-5); (III) alleged Failure

to Comply With the FOIA (Counts 6-7, 11, and 14); and (IV) alleged Failure to Comply With the

PRA (Count 8).

**ARGUMENT**

**I.    The BOP's Inmate Telephone System II ("ITS II") requirement to push 5 before an inmate's domestic telephone calls are connected does not violate Plaintiff's First Amendment rights.**

Plaintiffs allege that the push "5" requirement of the ITS II system violates their First

Amendment rights, by depriving Plaintiffs of an opportunity to communicate by telephone with

parties who use an automated telephone answering system ("ATAS"), such as certain courts and businesses (emphasis added).  *See* Dkt Entry No. 46-2, Plaintiffs' Mem. at 2-3.  Plaintiffs challenge the BOP's use of this system as an impermissible restriction on an inmates' means of communicating with persons outside prison walls, on the basis that it "further strains already strained relationships" and "is irrational because there is no comparable requirement for international calls." *Id.* at 4; Decl. of Sample § 14; Decl. of Shaw § 1; Decl. of Perry Orlando § 1-2.

It is well settled that the BOP has "considerable discretion to implement policies for the administration of correctional facilities and [is] free to formulate rules . . . that impinge on fundamental rights so long as they are 'reasonably related to legitimate penological objectives." ' *Levi v. Nash*, 2005 WL 3610346, (D.D.C 2005), quoting *Crawford-El v. Britton*, 951 F.2d 1314, 1318 (D.C.Cir.1991) (quoting *Turner v. Safley*, 482 U.S. 78, 87 (1987) (internal quotation omitted)); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987); *Jefferson v. Gonzales, Slip Copy,* 2006 WL 1305224, *2 (D.C. Cir. 2006); *Levitan v. Ashcroft*, 281 F.3d 1313 (D.D.C.,2002).  While inmates retain First Amendment rights while incarcerated,

> [l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285(1948). The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives-including deterrence of crime, rehabilitation of prisoners, and institutional security. *Pell v. Procunier, supra*, 417 U.S., at 822-823, 94 S.Ct., at 2804; *Procunier v. Martinez*, 416 U.S. 396, 412, 94 S.Ct. 1800, 1810-11, 40 L.Ed.2d 224 (1974).

*O'Lone v. Estate of Shabazz*, 482 U.S. 342, (1987), *Kimberlin v. U.S. Department of Justice*, 318 F.3d 228 ( D.D.C. 2003); *see also Harrison v. Federal Bureau of Prisons*, 464 F.Supp.2d

552, 555-556 (E.D.Va. 2006), *citing Vester v. Rogers,* 795 F.2d 1179, 1182 (4th Cir.1986)

("Although a prisoner does not shed his first amendment rights at the prison portals, it is equally

true that lawful incarceration brings about the necessary withdrawal or limitation of many

privileges and rights." ).  As pointedly stated by the Supreme Court in *Overton v. Bazzetta*,

> [t]he very object of imprisonment is confinement.  Many of the liberties and
> privileges enjoyed by other citizens must be surrendered by the prisoner. An
> inmate does not retain rights inconsistent with proper incarceration." *See Jones v.*
> *North Carolina Prisoners' Labor Union, Inc*., 433 U.S. 119, 125, 97 S.Ct. 2532,
> 53 L.Ed.2d 629 (1977); *Shaw v. Murphy*, 532 U.S. 223, 229, 121 S.Ct. 1475, 149
> L.Ed.2d 420 (2001). And, as our cases have established, freedom of association is
> among the rights least compatible with incarceration. *See Jones*, *supra*, at
> 125-126, 97 S.Ct. 2532; *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d
> 675 (1983). Some curtailment of that freedom must be expected in the prison
> context.

*Overton v. Bazzetta*, 539 U.S. 126, 131 (2003).  Moreover "prisoners have no *per se*

constitutional right to use a telephone." *Id.,*  quoting *United States v. Footman,* 215 F.3d 145,

155 (1st Cir.2000).  *See also Valdez v. Rosenbaum*, 302 F.3d 1039, 1048 (9th Cir.2002) (the use

of a telephone is merely one way to exercise the First Amendment right to communicate beyond

the prison), *cert. denied*, *Valdez v. Rosenbaum*, 538 U.S. 1047 (2003).  In *Overton v. Bazzetta*,

the Supreme Court  articulated four factors that must be addressed in analyzing prison

regulations for constitutionality.  These are:

> whether the regulation has a " 'valid, rational connection' " to a legitimate
> governmental interest; whether alternative means are open to inmates to exercise
> the asserted right; what impact an accommodation of the right would have on
> guards and inmates and prison resources; and whether there are "ready
> alternatives" to the regulation. 482 U.S., at 89-91, 107 S.Ct. 2254."

*Overton*, at 132.  Thus, so long as there is a "rational relation to legitimate penological interests,"

the BOP's judgment in utilizing the ITS system and the Push 5 requirement is entitled to

4

substantial deference, as the BOP "bear[s] a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *See, e.g.*, *Pell, supra*, at 826-827; *Helms*, *supra*, at 467; *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989); *Jones, supra*, at 126, 128; *Turner, supra*, at 85, 89; *Block v. Rutherford*, 468 U.S. 576, 588 (1984); *Bell v. Wolfish*, 441 U.S. 520, 562 (1979).

### A.    The BOP's telephone policy has a valid, rational connection to a legitimate governmental interest.

As part of its goals of preserving the security of prisons and protecting the public, the BOP established the ITS system and the "Push 5" requirement. *See* BOP Program Statement, Telephone Regulations for Inmates, January 31, 2002; 28 C.F.R. § 540.105, Expenses of Inmate Telephone Use. The purpose of the "Push 5" requirement is to prevent unwanted calls from inmates to the general public, and to expedite the process by which a recipient of an inmate's call may prevent an inmate from making further calls to that number. Decl. of Atwood § 7. The "Push 5" requirement is only for domestic telephone calls made in the United States and its territories. *Id.* Call recipients in foreign countries are not required to "Push 5" on their telephones to receive an inmate call, primarily because language barriers, and differences in telephone systems, would prevent the feature from functioning properly, and would further increase the cost of an already financially burdensome process. *Id.* § 5. For inmates who wish to call their legal counsel, the BOP provides an alternative method to make calls that is outside of the Inmate Telephone System. *Id. § 6.* Calls to an inmates' legal counsel do not utilize the "Push 5" system and, unlike the "Push 5" system, do not limit access to offices utilizing a switchboard. *Id.* However, obtaining a called party's permission to accept an inmate's call is

the industry standard, and has been approved by the FCC.  *Id.* § 4; *see* 47 C.F.R. § 64.710(3); 28

C.F.R. § 540.101(2).

Pursuant to these policies and procedures, the BOP implemented the ITS system, which

permits civilians who receive a telephone call from a federal inmate to deny and/or block further

calls from the inmate through a home telephone.  *See* BOP Program Statement, Telephone

Regulations for Inmates, January 31, 2002.

**B.     Plaintiffs Have Other Means of Exercising Their First Amendment Rights**.

Plaintiffs have submitted three declarations in support of their argument that the "Push 5"

system violates their First Amendment rights.  *See* Dkt. Entry Nos. 46-4, 46-5, Decl. of Sample,

Shaw and Orlando.  The declarations complain of being unable to call certain friends or relatives

at certain work numbers that utilize an ATAS system.  Decl. Orlando § 2.  One declaration also

complains that the monthly 300 minute time limit is burdensome for one prisoner, who spends

his entire 300 minute allotment talking to his fiancee.  *Id.* § 3.

There is no constitutional right to make personal calls to friends and relatives at their

places of employment.  Plaintiffs have several other options beyond making personal calls to

their friends and relatives during their work hours.  Plaintiffs may instead choose to call their

friends and relatives at home, or on their personal cell phones.  Plaintiffs may also write letters to

their friends and relatives.  Finally, Plaintiffs may also encourage their friends and loved ones to

visit them regularly in prison.  *See* BOP Program Statement 5264.07 at 1 (Inmates have several

means of communicating with the public "primary among them is written correspondence, with

telephone and visiting privileges serving as two supplemental methods.")

Thus, Plaintiffs have other means of exercising their First Amendment rights, namely by not calling friends and family members at work, or by calling their friends or families at home on their home telephones or personal cell phones.  Inmates may also contact businesses in writing and request alternative direct dial numbers from these businesses.  *See BOP Program Statement, Correspondence*, July 9, 1999*;  BOP Program Statement, Visiting Regulations*, May 11, 2006. Moreover, with the assistance of BOP staff, Plaintiffs have other means of making direct dial calls of an emergency or legal nature.

**C.      Accommodation of Plaintiffs' Request Would Have An Unduly Burdensome Impact on Correctional officers, Inmates and Prison Resources**.

In order to accommodate Plaintiffs' purported First Amendment right to direct dial national  telephone numbers by removing the "Push 5" procedure, BOP would have to return to its previous system of providing written notification to each individual an inmate placed on his or her permitted telephone list.  *See* Decl. Of Atwood § 7.   As the BOP has over two million phone numbers on record, this would present a considerable expense, and a significant drain on BOP's resources. *Id.*  BOP would have to contact each of the potential call recipients, and establish and maintain a record of those who do not wish to be contacted. *Id.*  The previous system also resulted in delays, as an inmate who wished to place a call was not permitted to place a call until written permission  was received by the BOP from the intended recipient of the call.  Id. §§ 4, 7.

**D.      Any Alternative to the Current Push 5 Requirement Would Be Unduly Burdensome**.

Finally, the BOP is faced with an absence of ready alternatives.  To accommodate Plaintiffs' direct dial request for domestic calls, the BOP would have to either eliminate the ITS Push 5 requirement in its entirety, which is what Plaintiffs seek, or develop another telephone

7

system for the entire federal prison system.   Because the BOP has over two million telephone

numbers on record, either alternative would drain the BOP's resources and impose a cost burden

on the BOP.   Decl. of Michael Atwood ¶ 7.   Contacting every potential call recipient to obtain

advance written permission would impose a considerable expense and expend significant staff

resources.  Id.  In addition, it would result in delays for inmates wishing to make calls, as the

written approval would have to have been obtained by the inmate in advance.

> Finally, Plaintiff argues that
>
> "[w]ith the removal of the push "5" requirement for international calls, the
> Plaintiffs can make direct dial calls to countries that are a part of the "Axis of
> Evil," and/or are centers of terrorist activity, but cannot make similar calls
> domestically. Decl. of Sample § 9; Decl. of Shaw [§ 2].  There is nothing rational
> about that."

This argument appears to undercut Plaintiffs' argument for releasing some of the

restrictions currently in place regarding an inmate's use of the telephone.  Instead, it supports the

BOP's rationale for imposing more restrictions on an inmate's telephone calls.  Plaintiffs do not

point to an alternative and instead seek to have the program simply declared unconstitutional.

In light of the considerable administrative and financial burdens inherent in removing the

"Push 5" requirement, it appears there is no ready, viable alternative.  Moreover, it is not the

responsibility of the BOP to "set up and then shoot down every conceivable alternative method

of accommodating an [inmate's] constitutional complaint." *Turner*, 482 U.S. at 90-91.  Instead,

if Plaintiffs can point to an "alternative that fully accommodates the prisoner's rights at *de*

*minimis* cost to valid penological interests, a court may consider that as evidence that the

regulation does not satisfy the reasonable relationship standard." *Id*. at 90.  Applying the *Turner*

*v. Safley,* 482 U.S. 78 (1987) standards, it is clear that the ITS II reflects a rational response by

the BOP to its legitimate governmental interest of protecting the public from unwanted contact from federal inmates.  (See 28 C.F.R. § 540.102).  The goal of protecting the public is "[not] so remote as to render the policy arbitrary or irrational."  *Turner*, 482 U.S. at 90.  For the reasons stated above, Plaintiffs' First Amendment claims should be dismissed.

## II.    Plaintiff's APA Claims Are Without Merit.

Plaintiffs allege that the BOP has failed to comply with the APA in five respects, with respect to several BOP Program Statements. Dkt. Entry No. 46-2 at 6-12.  The following Program Statements are at issue: Program Statement 5264.07, which governs Telephone Regulations for Inmates ("Telephone Regulations"); Program Statement P4500.05, the Trust Fund/Deposit Fund Manual ("Commissary Rates"); and Program Statement 5100.08, "Inmate Security, Designation and Custody Classification" (Sept. 12, 2006).  The Program Statement on Telephone Regulations governs, *inter alia,* (1) the ITS II Requirement to Push 5 Before Inmate's Domestic Telephone Calls are Connected; (2) Long Distance Prepaid Call Rates; and (3) BOP's 300 and 400 Minutes of Calling Time Limits Per Month.  The Program Statement on Commissary Regulations governs (4) BOP's Selling Price Formula for Items Sold at BOP Commissaries.  Lastly, the Program Statement on Inmate Custody governs (5) inmate transfers. As support for their allegations, Plaintiffs allege that BOP has failed to point to a rule that the Program Statements interpret, that BOP's interpretations represent a significant departure from past agency interpretation and practice, and that because BOP failed to comply with the APA's Notice and Comment Rule-making Requirements they are invalid.   For the reasons discussed below, Plaintiff's claims are without merit.

A.        **The Administrative Procedure Act**

As discussed in Defendants' MTD/MSJ at 12, the subsection of the APA requiring notice

and comment prior to promulgation of "legislative rules or regulations" does not apply to

"interpretative rules, general statements of policy, or rules of agency organization, procedure or

practice[.]" 5 U.S.C. § 553(b)(A).  The three challenged BOP Program Statements, concerning

telephone guidelines, commissary rates, and inmate transfers, are classic examples of internal

agency guidelines.  *See Kotz v. Lappin, -- F.Supp---*, 2007 WL 2937155 (D.D.C.); *Cook v. Wiley*,

208 F.3d 1314, 1317 (11th Cir. 2000) (a BOP Program Statement analogous to interpretative rule,

requiring no notice or comment).

Contrary to Plaintiffs' assertions, the APA does not require administrative

agencies to follow notice and comment procedures in all situations. Rather, 5 U.S.C. § 553(b)(3)

specifically exempts "interpretive rules, general statements of policy, or rules of agency

organization, procedure, or practice" from the requirement.  Because each of the challenged

policies are actually interpretive rules, this Court should dismiss these counts as without merit.

In *American Mining Congress v. Mine Safety & Health Administration*, 995 F. 2d 1106

(D.C. Cir. 1993), this Circuit articulated a four part test for determining whether a rule is

interpretative or substantive:

> insofar as our cases can be reconciled at all, we think it almost exclusively on the basis of
> whether the purported interpretive rule has "legal effect," which in turn is best ascertained
> by asking (1) whether in the absence of the rule there would not be an adequate legislative
> basis for enforcement action or other agency action to confer benefits or ensure the
> performance of duties, (2) whether the agency has published the rule in the Code of
> Federal Regulations, (3) whether the agency has explicitly invoked its general legislative
> authority, or (4) whether the rule effectively amends a prior legislative rule. If the answer
> to any of these questions is affirmative, we have a legislative, not an interpretive rule.

Id. at 1112.

The distinctive characteristics of interpretative statements, as contrasted with so-called regulations, have long been recognized.  Essentially, 'regulations', 'substantive rules' or 'legislative rules' are those which create law, usually implementary to an existing law; whereas interpretative rules are statements concerning an administrative officer's belief of what a particular statute or regulation means. While substantive or legislative rules are subject to certain procedural requirements,[1] including (1) advance publication in the Federal Register, (2) opportunity for the public to comment, and (3) publication of the final rule, incorporating a concise statement of its basis and purpose, at least thirty days before its effective date, "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" are exempt from these requirements.  *See* 5 U.S.C. § 553(b)(3)(A).  Because the Program Statements governing Telephone Guidelines, Commissary Rates and Inmate Transfers are classic examples of interpretative rules, they do not need to be promulgated through notice and comment procedures, even if the APA applies to this action.

The Supreme Court noted, in *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 99 (1995), that interpretative rules are those "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers."  *Id.* at 99.  Such rules do not effect a "substantive change" which is inconsistent with existing regulations.  *Id.*  Applying this test, it is apparent that the Program Statements challenged here have all of the hallmarks of a classic interpretative rule.

---

[1]        <u>See</u> 5 U.S.C. §§ 553(b) and (c).

11

A.     **Program Statement 5264.07, Telephone Regulations, ITS II Requirement to Push 5 Before An Inmate's Domestic Telephone Calls are Connected.**

Here, the BOP has promulgated an internal policy that is consistent with its statutory authority, which is to implement telephone guidelines for inmates in federal prisons. Under the BOP policy, procedures have been implemented in order to execute the Congressional mandate in 18 U.S.C. § 4042, which grants the BOP broad authority to manage and regulate the prison system. 18 U.S.C. 4042(a)(1); *Harrison v. Federal Bureau of Prisons,* 464 F. Supp.2d 552, 557-558 (E.D.Va. 2006). Pursuant to this statute, the BOP has published regulations governing telephone use by inmates. 28 C.F.R. § 540.105. The BOP has interpreted the regulations as authorizing the BOP to protect the public from unwanted contact from federal inmates. Previously, the BOP had effected this through a system which entailed providing written notification to every person placed on an inmate's telephone list. Decl of Atwood § 7. The BOP's implementation and use of the ITS Push 5 automated system is more efficient and less burdensome financially. *Id.*

B.     **The BOP's Long Distance Prepaid Call Rates**

Pursuant to the broad authority granted in 18 U.S.C. §4042, as discussed *supra*, the BOP is authorized to implement telephone cost guidelines for inmates in federal prisons and impose limitations consistent with the Bureau's correctional management responsibilities. 18 U.S.C. 4042(a)(1). Consistent with this statutory authority, the BOP has promulgated regulations at 28 C.F.R. § 540.100(a). The BOP has interpreted these regulations as authorizing the BOP to manage the ITS to ensure that it operates within the boundaries of budgetary allocations. This requires periodic evaluations of telephone calling rates, which must be periodically evaluated and

revised on an as-needed basis to keep the ITS self-sustaining.  Decl. of Michael Atwood § 8.  The

BOP previously used a banded system that set a per minute charge based on the distance between

the facility where the inmate was housed and the location of the telephone number called.  *Id.*

The BOP moved away from this system in 1998 to implement a standard calling rate.  *Id.*  With

the institution of the standard price, the rates must be periodically revised to ensure that the ITS is

not exceeding its budgetary limitations.  *Id.* Although the BOP had previously charged lower

rates, "prisoners are [not] entitled to a specific rate for their telephone calls." *Harrison v. Federal*

*Bureau of Prisons*, 464 F. Supp.2d at 556, *citing Johnson v. California*, 207 F.3d 650, 656 (9th

Cir. 2000).

C.      **The BOP's 300 and 400 Minutes of Calling Time Limits Per Month**.

Pursuant to 28 C.F.R. § 540.100(a), the BOP has promulgated an internal policy that is

consistent with its broad statutory authority, found in 18 U.S.C. 4042,  to implement restrictions

on the use of telephones by inmates in federal prisons.  Utilizing Program Statement

5264.007(10)(d)(1), the BOP has interpreted the regulations as authorizing the BOP to regulate

the length of time an inmate may spend in making telephone calls.  Previously, inmates were

permitted to make unlimited prepaid calls.  Decl. of Michael Atwood at § 9.  Recently, the BOP

implemented a 300 minute monthly calling time limit, increasing to a 400 minute limit in the

holiday months of November and December.  *Id.*  Consistent with its management policy, the

BOP instituted these limits to effectively manage the ITS and reduce the burden on staff and

financial resources.  *Id.*

13

**D.      The BOP's Selling Price Formula for Items Sold at BOP Commissaries**.

Pursuant to 31 U.S.C. § 1321, the BOP operates and manages prison commissaries.  Decl. Of Atwood § 10.  Pursuant to this statute, the BOP has published regulations at 28 C.F.R. § 0.95, and has promulgated an internal policy that is consistent with its statutory authority, to establish a selling price formula for items sold at BOP commissaries.  *Id.*   The BOP has interpreted the regulations as authorizing the BOP to compute prices and implement mark-ups.  *Id.*  Certain items are exempt from mark-ups.  Id.  Periodic mark-ups are necessary to ensure that the commissary operates within its budget.  *Id.* § 11.  As previous Courts have held, any challenges regarding the constitutional validity of the BOP's mark up of commissary items must fail, as there are no limitations upon the manner in which the BOP prices goods in the commissaries.  *See Prows v. U.S. Dept. of Justice*, 1991 WL 111459 (D.D.C. 1991); *French v. Butterworth*, 614 F.2d 23, 24 (1st Cir.1980); *Bagwell v. Brewington-Carr*, 2000 WL 1239960,2- 3 (D.Del.2000) ("an inmate has no constitutionally protected right to purchase food or other items as cheaply as possible through the prison commissary" ).

**E.      The BOP's Discontinuance of Its Educational Transfers Program Does Not Violate the APA.**

Pursuant to 28 C.F.R. § 0.95, the BOP has promulgated an internal policy that is consistent with its statutory authority, found in 18 U.S.C. § 3621(e) to determine inmate custody and transfers.   The BOP determines transfers based on Program Statement 5100.08, Inmate Security, Designation and Custody Classification (Sept. 12, 2006).  Plaintiff has not pointed to any program statement that BOP has had in the past or present that specifically addresses educational transfers.  That is likely due to the fact that transfer of an inmate is based on a host of

14

factors, including an inmate's institution classification, moving to a location nearer the release location, disciplinary/close supervision, adjustment, medical/psychological treatment, temporary transfers, training purposes/program participation, Institution Hearing Program, and pre-release transfers to a Community Corrections Center. *Id.* As the BOP has not discussed educational transfers in any program statement, past or present, Plaintiffs fail to demonstrate how BOP has changed its policy regarding educational transfers.

Regardless, "[b]ecause decisions regarding the designation of inmates to a particular prison program or facility are discretionary, these agency actions are not subject to review under the APA." *Palomino v. Federal Bureau of Prisons*, 408 F. Supp. 2d 282, 290-291 (S.D.Tex. 2005); *citing Lincoln v. Vigil*, 508 U.S. 182, 193 (1993); *Prows v. Federal Bureau of Prisons*, 981 F.2d 466, 469 (10th Cir.1992) (indicating BOP has authority to decide where to confine inmates prior to release), *cert. denied*, 510 U.S. 830, (1993)). Thus, the BOP's alleged "discontinuance" of its educational transfers program does not violate the APA.

In sum, Plaintiffs have failed to demonstrate that the BOP has violated the APA with respect to the (1) ITS II requirement to Push 5 before an inmate's domestic telephone calls are connected; (2) BOP's long distance prepaid call rates; (3) BOP's 300 and 400 minute monthly calling time limits; (4) BOP's selling price formula for items sold at BOP commissaries; and (5) BOP's alleged "discontinuance" of its educational transfers program. First, as demonstrated *supra,* BOP has an adequate legislative basis for each of its actions. Second, the Program Statements were issued in informal documents, and were not issued in the Code of Federal Regulations. Third, the BOP did not explicitly invoke its legislative or rulemaking authority in issuing the Program Statements. Lastly, the policies implemented effected no change, substantive

15

or otherwise, that is inconsistent with the existing regulations or any prior legislative rule. Because the Program Statements are not contrary to any legislative rule, the Program Statements are simply interpretative rules under the law of this Circuit.  *See American Mining Congress*, 995 F. 2d at 1112.

      **F.**      **Even if the APA applies here, Plaintiff has not Shown that the BOP's Actions were Arbitrary and Capricious.**

      As demonstrated above, the BOP has promulgated policies consistent with its statutory mandate.   Because BOP's interpretations reflect reasonable interpretations of its regulations, Plaintiffs have failed to demonstrate that BOP has abused its discretion.  Where an agency's interpretation reflects a reasonable interpretation of its regulations, its actions cannot be considered arbitrary or capricious.  *See, e.g., Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) ("[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); *Southern Co. Services, Inc. v. FCC*, 313 F. 3d 574, 579-80 (D.C. Cir. 2002); *HCA Health Servs. Of Okla., Inc. v. Shalala*, 27 F. 3d 614, 616-17 (D.C. Cir. 1994); Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984); *Auer v. Robbins*, 519 U.S. 452, 461-463 (1997); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

      Courts have consistently held that BOP Program Statements are internal agency guidelines not subject to the notice and comment requirements of the APA.  *See, e.g., Reno v. Koray,* 515 U.S. 50, 61 (1995) (describing BOP Program Statements as "internal agency guideline . . . akin to an 'interpretive rule' that 'does not require notice and comment'" in case involving Program Statement 5880.28 concerning BOP's crediting of detention time).  *See also*

16

*Gunderson v. Hood*, 268 F.3d 1149, 1151 (9th Cir. 2001) (same for Program Statement 5162.02 authorizing up to one year early release for successful completion of drug abuse treatment program); *Cunningham v. Scibana*, 259 F.3d 303, 306 (4th Cir. 2001) (Program Statement 5162.04 regarding crimes of violence and early release for successful substance abuse treatment); *Hendrickson v. Guzik*, 249 F.3d 395 (5th Cir. 2001) (Program Statement concerning notice to local law enforcement of release of criminals convicted of firearms offenses); *Downey v. Crabtree*, 100 F.3d 662, 666 (9th Cir. 1996) (Program Statement concerning drug abuse treatment programs containing early release provisions); *Cook v. Wiley*, 208 F.3d 1314, 1317 (11th Cir. 2000) (BOP Program Statement is analogous to an interpretative rule, and thus does not require notice and comment)). Each of these cases involved BOP Program Statements with far more potential to affect substantive rights of prison inmates than the telephone guidelines and commissary rates challenged here.

Even if this Court were to ignore the precedents above specifically addressing BOP Program Statements and rely instead on this Court's precedents defining "internal" agency guidance generally, it is equally clear that only "if an agency, 'by its action . . . intends to create new law, rights or duties, the rule is properly considered to be a legislative rule,' and thereby subject to the APA's notice and comment requirements." *Fertilizer Institute v. United States Environmental Protection Agency*, 935 F.2d 1303, 1308 (D.C. Cir. 1991)). Plaintiff alleges that although several BOP policies are interpretive, the interpretations are inconsistent with prior interpretations and practice, triggering Notice and Comment requirements and are a significant departure from past agency interpretation and therefore subject to Notice and Comment rulemaking. <u>See</u> generally Cross-MSJ at 6-12.

These claims fail as it is well settled that the APA requires that agency action be upheld unless it is "arbitrary capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706 (2)(A). "Review under this provision is 'narrow,' limited to examining the administrative record to determine 'whether the agency decision was based in consideration of the relevant factors and whether there has been a clear error of judgment." *Natural Resources Defense CouncilRDC v. Muszynski*, 268 F.3d 91, 97 (2d Cir. 2001) (quoting *City of New York v. Shalala*, 34 F.3d 1161, 1167 (2d Cir. 1994)). In making this determination, the Court need only be "satisfied that the agency examined the relevant data and established a 'rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Auto Ins. Co.*, 463 U.S. 29, 43 (1983), *cert. denied*, 531 U.S. 1070 (2001). Moreover, courts generally defer to the BOP's considerable judgment and expertise in penal matters. *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

Also, rulemaking procedures under the APA are only required if an interpretation adopts a new position inconsistent with existing regulations. *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 100 (1995) (dictum); *Tripoli Rocketry Association, Inc. v. United States Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 337 F.Supp.2d 1, 13 (D.D.C. 2004); *National Family Planning & Reproductive Health Ass'n. v, Sullivan*, 979 F.2d 227, 240-41 (D.C.Cir. 1992); *see Gunderson*, 268 F.3d at 1154. The amount of change required to trigger APA procedures *must be significant. Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94-95 (D.C.Cir. 1997); *Alaska Professional Hunters Ass'n, Inc. v. F.A.A.*, 177 F.3d 1030, 1034 (D.C. Cir., 1999) (defining rulemaking, which is governed by notice and comment, as the agency process for formulating, amending, or repealing a rule). "When an agency has given its regulation a

18

definitive interpretation, and later *significantly* revises that interpretation, [it] has in effect amended its rule, something it may not accomplish without notice and comment." Id. (emphasis added). APA procedures are only required when an agency's interpretation of a regulation constitutes a fundamental modification of its previous interpretation. *See Paralyzed Veterans of America*, 117 F.3d 579, 586.

APA procedures are only required where the new interpretation is fundamentally different from the original interpretation. Where an agency's interpretation is fairly encompassed within the language of the regulation, as is the case here, there is no substantive rule or modification that would require notice and comment. *Air Transport Ass'n of America v. F.A.A.*, 291 F.3d 49, 56 (D.C.Cir. 2002).

## III.    THE BOP IS IN COMPLIANCE WITH THE FOIA.

Plaintiff Sample alleges that the BOP has failed to comply with the FOIA with respect to (1) not providing him with a Copy of his Pre-Sentence Investigation Report ("PSI"), (2) not permitting him to inspect another inmate's PSI, (3) not providing copies of purchases from a Cajun Deli in Louisiana, and (4) not making certain records available electronically. For the following reasons, Plaintiffs' FOIA claims must be dismissed.

### A.    Section 5 U.S.C. § 552a(3)(B) of the FOIA Does Not Require Defendant BOP to Provide Plaintiff Sample With a Copy of His PSI.

The Court of Appeals for the D.C. Circuit decided, in *Martinez v. Bureau of Prisons,* 444 F.3d 620 (D.C. Cir. 2006), that the requirements of FOIA are satisfied by allowing inmates access to their pre-sentence report, rather than providing copies of the inmates' PSI to the inmates. It is undisputed that Sample is an inmate, and that Sample requested a paper copy of his PSI. Because the law in the District of Columbia is that inmates are not entitled to possess a copy of their PSI,

for their own safety, the BOP was not required to release a paper copy of Sample's PSI to him,

only to allow him access to it.  *Id.* at 625.  This issue is distinguishable from the issue litigated in

*Sample v. Bureau of Prisons*, 466 F.3rd 1086, 1089 (2006), as the issue in that case was whether

BOP was required to release the requested documents in an electronic format.  As the Court

stated, in its own words,

> *Martinez* did not construe the "form or format" requirement at all because
> format-in the sense of paper documents or electronic data-was not at issue. Rather,
> our holding in *Martinez* was limited to whether FOIA required BOP to permit an
> inmate to possess records in his cell, an issue that was unaffected by the 1996
> amendments. Therefore, *Martinez* is not applicable here.

Thus, because the answer to the question of whether the BOP is required to release an inmate's

PSI to him under the FOIA is "no", and because this outcome was unaffected by the court's

holding in *Sample v. Bureau of Prisons*, Plaintiff's argument must fail, and Count 6 of Plaintiffs'

Complaint must be dismissed.

**B.**     **The FOIA Does Not Require The BOP to Permit An Inmate to Inspect
Another Inmate's PSI.**

The BOP's reasons for limiting an inmate's access to their own and other inmates' PSI's

are found in Program Statement 1351.05, Release of Information.  The Program Statement,

adopted for "safety and security reasons," was specifically implemented to prevent sensitive

information concerning an "inmates' government assistance, financial resources, community

affiliations" to become known to other inmates.  *See* Program Statement 1351.05 at 15.  It was

also implemented because the BOP "has documented an emerging problem where inmates

pressure other inmates for a copy of their PSRs and SORs to learn if they are informants, gang

members, [or] have financial resources."  *Id.*  Further, "[i]nmates who refuse to provide the

documents are threatened, assaulted, and/or seek protective custody.  Likewise, inmates providing

PSRs and SORs containing harmful information are faced with the same risks of harm." *Id.* at

15-16. *See e.g., Matsey v. U.S. Dept. of Justice*, *Not Reported in F.Supp.2d*, 2005 WL 1017867

(D.D.C. 2005); *Delgado v. Bureau of Prisons, Slip Copy*, 2007 WL 2471573, *2 (E.D. Tex.

2007). Thus, Count 7 of Plaintiffs' Complaint must be dismissed.

> **C.     The BOP Has Released All Records Responsive to Plaintiff's FOIA Request for Materials Concerning the Purchase of Passover Meals During 2004-2006 at FCI Beaumont (Low) and the Purchase of a Sukkah by the Religious Services Department at FCI Beaumont (low) in 2004- 2005.**

Plaintiff's Cross-MSJ specifically alleges that the BOP has not released records from a

"Kosher Cajun Deli in Louisiana."   In response, FCC Beaumont Low Chaplin, James Watanabe

conducted a new search for responsive records on September 7, 2007. *See* Decl. Watanabe .  As

part of the search, Chaplin Watanabe reviewed the tracking report for all expenditures by FCC

Beaumont's Religious Services Department for Fiscal Year 2004. *Id.* § 3.  While other BOP

facilities made purchases from the Kosher Cajun Kitchen during the time period referenced in

Plaintiffs' FOIA request, FCC Beaumont Low did not. *Id.*  Thus, no responsive records exist.

Because all records responsive to Plaintiffs' request have been released, Plaintiffs' claim with

respect to Count Eleven is moot and should be dismissed. *See Lepelletier v. FDIC*, 23 Fed.

Appx. 4, 6 (D.C. Cir. 2001); *Matter of Wade*, 969 F.2d 241, 248 (7th Cir. 1992)

**IV.          The BOP's Compliance With the Paperwork Reduction Act.**

It appears that Plaintiffs do not have a private right of action under the Paperwork

Reduction Act. *Tozzi v. EPA* , 148 F.Supp 2d 35, 43 (2001) ("[c]ourts that have addressed the

issue have consistently held that there is not a private right of action under the PRA.").

However, in an effort to determine its responsibilities under the Paperwork Reduction Act

("PRA"), the BOP has requested that all of the documents in question be reviewed by Department

of Justice's Office of the Chief Information Officer ("OCIO").  This component is responsible for

providing information technology leadership and for improving the management effectiveness of

the DOJ and its branches.  If OCIO is unsure about the BOP's responsibilities under the act with

regard to these documents, they will seek the assistance of the Office of Management and Budget

("OMB") in this matter.  If, after consulting with OCIO and perhaps OMB, the BOP is not in

compliance with the act, the agency will begin all necessary steps to insure complete compliance.

Thus, the government will file a report to the Court within 30 days addressing Count 8 of the

Plaintiffs' Complaint, and indicating the status of the BOP's compliance under the PRA.

### V.    Plaintiffs Lack Standing to Assert That BOP Has Not Complied with the Electronic Freedom of Information Act Amendments.

Lastly,  Count 14 of Plaintiffs' Complaint pertains to Plaintiffs' FOIA request that the

BOP post various documents on the Department of Justice website.  BOP responded that a

request to post documents on a website is not a proper request under the FOIA.  Plaintiffs now

assert that the Court should compel the BOP to post various documents electronically pursuant to

the APA.  Plaintiffs, however, lack standing under the APA to assert this cause of action.

In order to have standing to sue under Article III, a plaintiff must have actually been

injured by a defendant's conduct.  The Constitution requires a plaintiff to establish three elements

to demonstrate standing to sue the federal government for failure to carry out its executive

functions.  *Valley Forge Christian College v. Americans United for Separation of Church and

State,* 454 U.S. 464, 472 (1982); *see also National Wrestling Coaches Assoc. v. U.S. Department

of Education*, 263 F. Supp. 82, 105-106 (D.D.C. 2003).  First, the plaintiff must show that he or

she has suffered an "'injury in fact' — an invasion of a legally protected interest which is (a)

concrete and particularized, . . .  and (b) 'actual or imminent' not 'conjectural' or 'hypothetical'".

*Lujan,* 504 U.S. at 560; *see also Bensenville v. FAA*, 376 F.3d 1114, 1118-19 (D.C. Cir. 2004).

Second, the alleged injury must be "traced to the challenged action." *Lujan*, 454 U.S. at 560

(*quoting Simon v. Eastern Kentucky Welfare Rights Org*., 426 U.S. 26, 41-42 (1976); *see also*

*Florida Audubon Society v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996). Third, the alleged

concrete injury must be "likely to be redressed by a favorable decision" of the court hearing the

matter. *Valley Forge*, 454 U.S. at 472; *see also Florida Audubon Society*, 94 F.3d at 661. In this

Circuit, "the central analysis is directed at discovering legislative intent by means of 'the language

of the statute, the statutory structure, or some other source.'" *Tax Analysts v. IRS*, 214 F.3d 179,

186 (D.C. Cir. 2000), *quoting  Karahalios v. National Fed'n of Fed. Employees, Local 1263*, 489

U.S. 527, 532-33 (1989), as quoted in *Government of Guam v. American President Lines*, 28 F.3d

142, 145 (D.C. Cir.1994).

Further, in order to demonstrate standing for a claim requesting declaratory or injunctive

relief (such as the mandamus[2] sought here), "[t]he plaintiff must show that he 'has sustained or is

immediately in danger of sustaining some direct injury' as the result of the challenged official

conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or

'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (citations omitted); *see*

*also Branton v. FCC*, 993 F.2d 906, 908 (D.C. Cir. 1993). In *Branton*, a citizen challenged the

---

[2]  Plaintiffs have filed a mandamus claim under 28 U.S. C. 1361.   A writ of mandamus does not confer an independent basis of jurisdiction but rather merely supplies a permissible remedy in actions otherwise properly brought on independent jurisdictional grounds. *See Udall v. Oil Shale Corp.*, 406 F.2d 759 (10th Cir. 1969); *Prairie Band of Pottawatomie Tribe of Indians v. Udall*, 355 F.2d 364 (10th Cir. 1966), *cert. denied*, 385 U.S. 831, 87 S. Ct. 70, 17 L. Ed. 2d 67; *Smith v. United States*, 224 F. Supp. 402 (D.Wyo.1963), *aff'd*, 333 F.2d 70 (10th Cir. 1964); *International Fed. of P. & T. Eng., Loc. No. 1 v. Williams*, 389 F. Supp. 287, 290 (E.D.Va.1974). (See also n.2, *infra*.)

FCC's ruling that a radio broadcast that contained profanity was not "indecent" because the tape was part of a "bona fide" news story. The court held the "possibility that the petitioner will again some day be exposed to broadcast indecency lacks the imminence required under Lyons…" *Branton*, 993 F. 2d at 909.

The statute at issue here provides that "[e]ach agency shall make available to the **public** information as follows . . ." 5 U.S.C. § 552(a)(emphasis added) . As in *Branton*, Plaintiffs here have provided absolutely no evidence that they will suffer immediate harm if BOP does not post the documents at issue on its website, and the possibility of some harm in the future is too attenuated to establish a real injury. Further, as inmates, Plaintiffs are obviously incarcerated and therefore lack access to public or electronic reading rooms. As such, Plaintiffs cannot demonstrate that they have suffered any injury that "fairly can be traced to the challenged action of the defendant," *Simon v. Eastern Ky. Welfare Rights Org*., 426 U.S., at 41. Thus, Plaintiffs here have suffered no harm and thus lack standing to advance this action because they cannot establish harm to them or their interests from the alleged violation. They have no personal stake in the outcome*. Duke Power Co. v. Carolina Environmental Study Group, Inc.*,438 U.S. 59, 72 (1978 ("the essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have 'alleged . . . a personal stake in the outcome of the controversy . . ." such that a plaintiff can demonstrate "not only a 'distinct and palpable injury, but also a "fairly traceable" causal connection between the claimed injury and the challenged conduct." *Id.*, *quoting Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Arlington Heights v. Metropolitan Housing Dev. Corp*., 429 U.S. 252, 261,(1977).

As Plaintiffs have failed to satisfy the elements of the test, Plaintiffs lack standing to

assert this claim, and the Court lacks subject matter jurisdiction to hear it. Since Plaintiffs complain of no injuries with respect to the BOP's alleged failure to comply with the PRA, the Plaintiffs lack standing to advance this argument. *Powers v. Ohio*, 499 U.S. 400, 410 (1991) ("a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or third parties").

Further, APA review is unavailable because Plaintiffs have an adequate remedy under FOIA. Plaintiffs may simply make a FOIA request for any documents they seek, which they would need to do in any event as they do not have access, as inmates, to electronic reading rooms. Thus, FOIA provides an adequate remedy.

## CONCLUSION

For the foregoing reasons, summary judgment should be granted in favor of the Defendant.

Respectfully submitted,

_____Jeffrey A. Taylor_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_____Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

_/s/ Sherease Pratt_____
SHEREASE PRATT
Special Assistant United States Attorney
Of Counsel:                                United States Attorney's Office
Wanda Hunt, Esq.                           555 4th Street, N.W.
Delaine Hill, Esq.                         Washington, D.C. 20530
Federal Bureau of Prisons
Washington, D.C.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **BRANDON SAMPLE, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 06-0715 (PLF)** |
| | ) | |
| **FEDERAL BUREAU OF PRISONS, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**CERTIFICATE OF SERVICE**

I  **HEREBY  CERTIFY** that on this 14th day of November 2007, I caused a true and

correct copy of the foregoing motion and proposed order to be served upon *pro se* Plaintiffs

Brandon Sample and Bernard Shaw, by placing copies in the United States mail, via First Class

prepaid postage, addressed as follows:

BRANDON C. SAMPLE, # R33949-037

Brandon Sample # 33949-037
Federal Prison Camp
P.O. Box 9300
Texarkana, TX 75505

Bernard Shaw, # R59469-004
Federal Satellite Low
2680 Highway 301 South
Jesup, GA 31599

                                     /s Sherease Pratt
                                     SHEREASE PRATT
                                     Special Assistant United States Attorney
                                     United States Attorney's Office
                                     Civil Division
                                     555 4th Street, N.W.,
                                     Washington, D.C. 20530
                                     (202) 307-0895