UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRANDON SAMPLE, ET AL.,                    )

v.                                         )        06-715 (PLF)

FEDERAL BUREAU OF PRISONS, ET AL.          )

## PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

While the argument presented by the Federal Bureau of Prisons (BOP) in reponse to Plaintiff's Motion for Summary Judgment (MSJ) is largely repetitious of BOP's own MSJ, Plaintiffs offer the following reply to BOP's opposition to Plaintiff's MSJ.[1]

**Argument**

(a)    Count One

Count One of the Plaintiff's Second Amended Complaint deals with two things, the consitutionality of BOP's so-called push "5" requirement, and whether the push "5" requirement was promulgated in accordance with the Administrative Procedures Act (APA). However, since courts are required to refrain from deciding constitutional questions if possible, Plaintiffs will address their APA claims first, although not presented in this order in the party's respective filings.

---

[1]    In opposing Plaintiff's MSJ, BOP did not respond to Plaintiff's Statement of Material Facts to Which There Exists No Genuine Issue. Accordingly, under Local CIvil Rule 7(h), the Court may assume that the facts identified in Plaintiff's statement of material facts are admitted. Local Civil Rule 7(h).

RECEIVED

DEC 2 1 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

(i)  The Push "5" Requirement Is A Significant
     Departure From Past Agency Interpretation And
     Practice

BOP acknowledges that when an agency gives a regulation a "definitive interpretation and later significantly revises that interpretation, [it] has in effect amended its rule, something it may not accomplish without notice and comment." Docket Entry 59 at 19. Nevertheless, BOP argues that the push "5" requirement does not constitute a significant departure from past agency interpretation and practice. Id. (emphasis in original). This contention, however, is belied by the record.

It is undisputed that prior to the implementation of the Inmate Telephone System II (ITS-II), there was no push "5" requirement. During this time, inmates were able to communicate telephonically with prepaid domestic called parties regardless of whether their calls were answered by an Automated Telephone Answering System (ATAS). After the push "5" requirement, though, things changed significantly. In particular, Plaintiffs "have been deprived of the opportunity to communicate telephonically with U.S. prepaid called parties who use an ATAS." Plaintiff's Statement of Material Facts to Which There Exists No Genuine Issue ¶ 4. This inability to communicate telephonically with certain persons combined with BOP's about face from permitting direct dial calls to the push "5" requirement is a significant departure from past BOP interpretation and practice that should have been submitted for notice and comment before its adoption. Accordingly, the Court should set aside the push "5" requirement as its promulgation violated the APA.

2

(ii)     The Push "5" Requirement Cannot Withstand
          Consitutional Scrutiny

For the first time in response to Plaintiff's MSJ, BOP undertakes the four part Turner v. Safley, 482 U.S. 78 (1986) inquiry regarding the constitutionality of the push "5" requirement.  In doing so, BOP claims that (1) the push "5" requirement is designed to prevent unwanted calls from inmates to the general public and to expedite the process by which a recipient of an inmate's call may prevent an inmate from making further calls to that number; (2) Plaintiffs have alternate means of exercising their First Amendment rights; (3) accommodating removal of the push "5" requirement would negatively impact staff and prison resources; and (4) there are no ready alternatives to the push "5" requirement.  Docket Entry 59 at 6-9.  Plaintiffs address each of these contentions in turn.[2]

(a)     The Push "5" Requirement Is Not Supported
         By A Valid, Rational Connection To A
         Legitimate Governmental Interest

The BOP claims that its push "5" requirement is supported by a valid, rational connection to a legitimate governmental interest because it helps "prevent unwanted calls from inmates to the general public" and "expedite[s] the process by which a recipient of an inmate's call may prevent an inmate from making further calls to that number." Docket Entry 59 at 5.  However, this is untrue.

───────────

[2]     Plaintiffs do not address the second Turner prong as they concede they have alternate means of exercising their First Amendment rights.

First of all, the push "5" requirement has absolutely nothing to do with a call recipient's ability to deny/block further calls from an inmate. Decl. of Sample ¶ 1. Instead, it is the "77" component of the voice prompt that enables called parties to deny/block calls from an inmate. Id.; Plaintiff's Statement of Material Facts To Which There Exists No Genuine Issue at ¶ 2 (the voice prompt for domestic prepaid calls states, "This call is from a federal prison. This is a prepaid call. You will not be charged for this call. This call is from (insert name of inmate calling). Hang up to decline the call or to accept the call dial '5' now. To block future prepaid calls from this person, dial '77'") (emphasis added). Plaintiffs are not challenging the lawfulness of the "77" procedure.[3]

Moreover, even if the Court were to conclude that the push "5" requirement is generally supported under BOP's protection of the general public theory, it is neither valid or rational to extend this same rationale to calls to courts and government agencies. Decl. of Sample ¶ 3. As with calls to certain family members and friends, Plaintiffs are unable to communicate telephonically with courts and U.S. government agencies due to the push "5" requirement. Id. Courts and

---

[3] Plaintiffs remind the Court that the first prong under Turner is a threshold inquiry. If the push "5" requirement is shown to be "arbitrary and irrational" (as it is), then "the regulation fails, irrespective of whether the other [Turner] factors [may] tilt in its favor. Shaw v. Murphy, 532 U.S. 223, 229-30 (2001) (alterations added).

government agencies, however, are not part of the "general public." Therefore, application of the push "5" requirement to calls by Plaintiffs to courts and agencies of the United States is unlawful.[4]

  (b) <u>Elimination Of The Push "5" Requirement Would Not Unduly Burden BOP Staff Or Prison Resources, And Ready Alternatives Exist</u>

  Assuming, <u>arguendo</u>, the push "5" requirement was supported by BOP's protection of the "general public" theory, accommodation of Plaintiff's right to make calls to family, friends, courts, U.S. government agencies, and other numbers that are answered by an Automated Telephone Answering System (ATAS) would not unduly burden correctional officers, inmates, or prison resources. Decl. of Sample ¶ 5. BOP claims that it would have to return to its previous system of providing written notification to each individual an inmate placed on his or her permitted telephone list, resulting in "considerable expense" and "a significant drain on BOP's resources," but this is not the case. Docket Entry 59 at 7.

  Prior to the implementation of the push "5" and "77" requirements, intended call recipients were notified via mail that their number had been placed on an inmate's telephone

---

[4] In addition, BOP in response to Plaintiff's MSJ erroneously intimates that FCC regulations require the push "5" requirement. <u>See</u> Docket Entry 59 at 6, citing 47 C.F.R. § 64.710(3). This regulation, however, does not apply to the prepaid calls at issue in this case. Rather, 47 C.F.R. § 64.710(a) deals with telephone calls that are not borne by the inmate. <u>Id.</u> 47 C.F.R. § 64.710(b)(3) (exempting calls from regulation that are automatically completed "with billing to the telephone from which the call originated").

list.  Decl. of Sample ¶ 6.  The purpose of the notification
was to afford callers the opportunity to block their number
from inmates.  Id.  Written notification, however, was not a
prerequisite to the inmate calling.  Id.  Rather, once a number
was added to an inmate's telephone list, the inmate was able to
begin calling immediately.  If someone who had their number
placed on an inmate's telephone list did not wish to receive
calls from an inmate, they could block their number by
notifying the institution in writing.  However, if the person
wanted to receive calls from an inmate, they need do nothing.
Thus, the costs and burdens associated with the written notice
procedure entailed (i) postage for the notification letter,
(ii) manpower to send the notification letter, and (iii)
manpower to record responses from callers who wanted their
number blocked.  Id.

Under the push "77" requirement, notification is
accomplished through a voice prompt which gives called parties
the option of blocking further calls to their number by pushing
"77." Decl. of Sample ¶ 7.  Additionally, call recipients may
choose to decline a call without blocking their number by
simply hanging up.  Id.  The push "5" requirement, on the other
hand, does not affect a callers' ability to deny/block inmates
from calling.  Instead, it deals with the acceptance of calls
from inmates.  Id.

In the instant case, BOP could accommodate Plaintiff's
request to place domestic prepaid calls absent the push "5"
requirement without unduly burdening its staff or resources.
For instance, the voice prompt for domestic prepaid calls could

be changed to say, "This call is from a federal prison. This is a prepaid call. This call is from (insert name of inmate calling). Hang up to decline the call. To block future prepaid calls from this person dial "77." Otherwise, this call will be connected in five seconds." Decl. of Sample ¶ 8. Under this revised procedure, a called party's ability to deny/block calls remains unchanged. The only difference is the elimination of the push "5" requirement in favor of the "otherwise, this call will be connected in five seconds" procedure. Id. While self-explanatory, the called party and the inmate would be automatically connected in five seconds after the "77" annoucement if the call recipient does not hang up or block their number by pushing "77." Id.

Utilization of the above procedure in lieu of the push "5" requirement would not require BOP to revert to its prior written notification procedures, would not require any substantive change to the BOP's Inmate Telephone System, and could be done at de minimis cost to the BOP. Decl. of Sample ¶ 9. Foremost, though, use of this revised procedure would retain BOP's ability to both "prevent unwanted calls from inmates to the general public and expedite the process by which a recipient of an inmate's call may prevent an inmate from making further calls to that number." Id. Accordingly, the push "5" requirement does not meet Turner's reasonableness inquiry, and should therefore be struck down as violating Plaintiff's First Amendment rights.

Counts Two- Five

As with Plaintiff's challenge to the push "5" requirement, BOP contends that its 300 and 400 minute limitation, increases in telephone calling rates, change in commissary markup formula, and policy prohibiting educational transfers do not represent significant departures from past agency interpretation and practice. Docket Entry 59 at 19. Each argument is addressed in turn.[5]

First, the 300 and 400 minute limitations are significant departures from past BOP interpretation and practice. It is undisputed that prior to the minute limitations, inmates were permitted <u>unlimited</u> prepaid calling. Decl. of Atwood ¶ 9 (emphasis added). Going from unlimited calling to 300 or 400 minutes a month is a significant change. Moreover, as set forth in the Plaintiff's declaration and Statement of Material Facts To Which There Exists No Genuine Issue, these monthly minute limitations have significantly hampered Plaintiff's ability to maintain telephonic contact with their friends and loved ones. Accordingly, the 300 and 400 minutes should be set aside as violating the APA.

Second, the increase in telephone calling rates constitutes a significant departure from past BOP interpretation and practice as well. While each of the challenged increases were

---

[5]    Plaintiff Sample has elected to abandon his challenge to the BOP's policy change concerning educational transfers and therefore does not address it.

8

only a few cents, these changes have cost Plaintiffs "at least $288 more during certain years." Pl. Statement of Material Facts to Which There Exists No Genuine Issue ¶ 9. This may not seem like much money, but for an incarcerated person, it is a substantial sum. Moreover, when you consider the effect of the increases BOP wide, the costs run into the millions. (there is currently 180,000 plus inmates in the BOP. If each inmate payed at least $100 more a year because of the increase-- nowehere near the maximum amount they could potentially pay-- the cost BOP wide would be at least $18,000,000). Thus, the increases in BOP's telephone rates should be deemed significant and set aside as violating the APA.

Lastly, the change in commissary markup formula is also a significant departure from past agency interpretation and practice. It is undisputed that for over 20 years, BOP used its prior markup formula. It is also undisputed that under the new markup formula, the selling price for items increased five percent. Decl. of Atwood ¶ 13. Finally, it is undisputed that the change has cost Plaintiffs "hundreds, if not thousands of dollars." Pl. Statement of Material Facts to Which There Exist No Genuine Issue ¶ 13. In other contexts, changes that substantially affect a regulated party's pocket book, like this one, have been deemed invalid for failure to conduct notice and comment. Shell Offshore Inc. v. Babbit, 238 F.3d 622, 630 (5th Cir. 2001). The Court should follow Shell and hold that BOP's change in commissary markup formula is invalid because it was not submitted for notice and comment before its adoption.

(c)    Count Six

Count Six of the Plaintiff's Second Amended Complaint challenges BOP's refusal to produce a copy of Plaintiff Sample's Pre-Sentence Investigation Report (PSI) to Sample. Initially, BOP claimed that Sample lacked standing to bring this claim, Docket Entry 39 at 16, but no longer defends this assertion in its opposition to Plaintiff's MSJ. See Docket Entry 59 at 19-20. Instead, BOP claims it is "not required to release a paper copy of Sample's PSI to him" because Martinez v. Bureau of Prisons, 444 F.3d 620 (D.C. Cir. 2006) held that the requirements of FOIA are satisfied by allowing inmates access to their PSI instead of possession. Id. Martinez, however, has no applicability to this case as Sample does seek to possess a copy of his PSI. Instead, the outcome of this count is controlled by Sample v. Bureau of Prisons, 466 F.3d 1086 (D.C. Cir. 2006).

In Sample, the D.C. Circuit had the occasion to consider two things (1) the form or format requirements of 5 U.S.C. § 552(a)(3)(B), and (2) whether FOIA dictated BOP provide Sample with access to a computer to inspect records obtained in electronic format. In addressing the second question, the D.C. Circuit held that FOIA did not require BOP to provide Sample with access to a computer to inspect electronic records obtained under FOIA. Id. at 1089. In so holding, the D.C. Circuit explained that BOP performs two roles when it comes to requests for information by an inmate under FOIA (1) FOIA respondent and (2) custodian of inmates. Id. Under the former role, BOP is required to produce records to an inmate without

10

regard to security issues that may be presented by the inmate's possession of certain records after they are produced. This is because issues surrounding access or possession of records by an inmate are not a part of the FOIA inquiry. Id. Instead, questions of access or possession are under the purview of BOP's latter role as custodian of inmates, a role that "only comes into play after the FOIA request has been completed." Sample, at 1089 (emphasis added).

In the instant case, BOP erroneously conflates its two roles. Sample is not arguing that FOIA requires BOP to permit him to possess a copy of his PSI. Instead, all Sample wants is for BOP to comply with its statutory obligation under FOIA to provide him with a copy of his PSI. As FOIA respondent, BOP's refusal to do so is simply indefensible. Accordingly, Sample respectfully requests the Court order BOP to produce a copy of Sample's PSI to Sample.

(d)      Count Seven

Count Seven of the Plaintiff's Second Amended Complaint challenges BOP's refusal to disclose a copy of inmate Richard Painter's PSI to Sample. Initially, BOP claimed that (1) it never properly received Sample's request for a copy of Painter's PSI; (2) Painter's PSI is protected from disclosure because it is under seal; and (3) Sample lacks standing to bring this claim. See Docket Entry 39 at 16-18. In response to Plaintiff's MSJ, though, BOP does not defend these positions. Instead, BOP argues that Sample cannot see Painter's PSI for security reasons.

11

Like with Count Six, BOP conflates its roles as FOIA respondent and custodian of inmates. As FOIA respondent, BOP has proffered no exemption supporting its refusal to produce Painter's PSI. Instead, BOP's whole argument centers around questions of access or possession, neither of which are a part of the FOIA inquiry. Whether Sample will be able to access or possess Painter's PSI only comes into play after Sample's request has been completed. Sample, at 1089. Accordingly, the Court should enter an order requiring BOP to produce a copy of Painter's PSI to Sample.

(e)     Count Eight

Count Eight deals with BOP's refusal to comply with the Paperwork Reduction Act (PRA). BOP responds to Plaintiff's MSJ arguing that Plaintiffs have no private right of action under the PRA. Docket Entry 59 at 21-22. Nevertheless, BOP indicates that it is undertaking efforts to determine its responsibilities under the PRA. Id.

While Plaintiffs may not have a private right of action under the PRA itself, the APA does provide a cause of action to address an agency's failure to comply with the PRA. Public Citizen, Inc. v. Lew, 127 F.Supp.2d 1, 9 (D.D.C. 2000). Although Plaintiffs did not cite the APA when referring to their PRA claims, Plaintiff's complaint should be liberally construed. Erickson v. Pardus, _____ U.S. _____ (2007). Liberally construed, Plaintiff's complaint states a claim for BOP's failure to comply with the PRA under the APA. However, in the interest of judicial economy, Plaintiff's request the Court defer ruling on their PRA claims until BOP's compliance

review is finished.  Should BOP acknowledge and voluntarily
agree to comply with the PRA, then no further court action
would be necessary.  If BOP continues to refuse to comply with
the PRA, though, Plaintiffs request a ruling on the merits of
Count Eight.

(f)    Count Eleven

Count 11 of the Plaintiff's Second Amended Complaint
involves the disclosure of records related to the purchase of
items from Kosher Cajun Deli for the Passover ceremonial meal
at FCI Beaumont (Low) during 2004.  In response to Plaintiff's
MSJ, BOP contends that no such records exist.  Docket Entry 59
at 21.  As evidence of this, BOP provides the declaration of
James Wantanabe, a chaplain at Beaumont (Low).  Docket Entry
59-2.  According to Wantanabe, the Religious Services
Department at Beaumont (Low) did not purchase any items from
Kosher Cajun Deli in 2004.  Id. ¶ 3.

While agency declarations regarding the adequacy of a
search for responsive records are ordinarily entitled to
deference, such deference is not due in this case.  Mr.
Wantanabe's declaration reflects only that the Religious
Services Department at FCI Beaumont (Low) did not purchase
anything from Kosher Cajun Deli in 2004.  It does not address
whether, for instance, any other department at FCI Beaumont
purchased items from Kosher Cajun Deli for the Passover meal in
2004.  This omission is important because to the best of
Plaintiff Sample's recollection, the items procured from Kosher
Cajun Deli in 2004 for the Passover ceremonial meal were
purchased by the Food Service Department, not the Religious

13

Services Department, at FCI Beaumont (Low). Decl. of Sample ¶ 10. Accordingly, the Court should order BOP to conduct a more thorough search of its records systems for responsive records related to this request.

(g)    Count Fourteen

Count 14 of the Plaintiff's Second Amended Complaint pertains to BOP's failure to (1) make available via computer telecommuncation means varios records from November 1, 1996, forward; (2) maintain records created on a computer in electronic format; and (3) undertake reasonable efforts to maintain its other records in electronic form. Docket Entry 46-2 at 20-26. In response to Plaintiff's MSJ, BOP does not address the second and third aspects of Count 14, nor does it dispute that the 13 categories of records listed in Plaintiff's MSJ at 23-24 are required to be made available via computer telecommunication means. Docket Entry 59 at 22-25. Instead, BOP hangs it hat on a nonsensical argument that Plaintiffs lack standing to seek the availability of records via computer telecommunication means because they will not suffer "immediate harm."[6] Id.

Contrary to BOP's arguments, Plaintiff Sample has standing to challenge BOP's failure to make the 13 categories of records

_____

[6] It is unclear whether BOP also challenges Plaintiff's standing with respect to the second and third aspects of Count 14. In any event, Plaintiffs have standing to assert these claims as set forth in ¶¶ 12-13 of the declaration of Brandon Sample.

14

listed in Plaintiff's MSJ available via computer telecommunication means. Public Citizen v. F.T.C., 869 F.2d 1541, 1548 n.13 (D.C. Cir. 1989) (Plaintiffs who bring actions under FOIA "clearly have standing merely by virtue of the fact that they have been denied information they have requested"). In addition, whether Plaintiff Sample will be able to access the material he seeks after its made available via computer telecommunication means is irrelevant to the standing analysis as with Counts Six and Seven--issues of access or possession only come into play after the FOIA request is completed." Sample, 466 F.3d at 1089 (emphasis added).

Moreover, to the extent BOP claims that inmates are not members of the public within the meaning of FOIA, this argument should be rejected. Under FOIA "any member of the public [has] as much right to disclosure as one with a special interest therein ... Congress granted the scholar and the scoundrel equal rights of access to agency records." Durns v. Bureau of Prisons, 804 F.2d 701, 706 (D.C. Cir. 1986) (internal citations omitted; alteration in original), vacated on other grounds, 486 U.S. 1029 (1988). Finally, even if access to the records were relevant to the standing analysis, Sample has access through a proxy. Decl. of Sample ¶ 11.

Because Sample has standing to bring his three part APA challenge premised upon violations of FOIA, and because BOP has presented no other argument as to why the requested relief should not be granted, the Court should (1) order BOP to make available from November 1, 1996, onward, the 13 categories of records listed in Plaintiff's MSJ via computer

telecommunication means; (2) order BOP to maintain its records created on a computer in electronic form in accordance with existing retention schedules; and (3) order BOP to undertake reasonable efforts to maintain all its other records in electronic form.[7]

## Conclusion

Based on the foregoing, Plaintiff's motion for summary judgment should be granted.

Respectfully submitted,

Brandon Sample #33949-037
Federal Prison Camp
P.O. BOX 9300
Texarkana, Texas 75505

Bernard Shaw #59469-004
Federal Satellite Low
2680 Highway 301 South
Jesup, Georgia 31599

---

[7]  Without citation to any authority or much elaboration, BOP also claims that Sample fails to state a claim under the APA because FOIA provides an adequate remedy.  Docket Entry 59 at 25.  FOIA, however, does not provide a remedy, much less an adequate remedy, for BOP's failure to make available the requested records via computer telecommunication means. Kennecott Utah Copper v. U.S. Dept. of Justice, 88 F.3d 1191, 1203 (D.C. Cir. 1996) (FOIA's relief provisions only permit a court to order the production of records).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRANDON SAMPLE, ET AL.,          )

v.                               )          06-715 (PLF)

FEDERAL BUREAU OF PRISONS, ET AL.    )

## DECLARATION OF BRANDON SAMPLE

I, Brandon Sample, declare under penalty of perjury that the following is true and correct:

**Count One**

1.      The Federal Bureau of Prisons (BOP) claims that its push "5" requirement is supported by a valid, rational connection to a legitimate governmental interest because it helps "prevent unwanted calls from inmates to the general public" and "expedite[s] the process by which a recipient of an inmate's call may prevent an inmate from making further calls to that number." Docket Entry 59 at 5. This is untrue. The push "5" requirement has absolutely nothing to do with a call recipient's ability to deny/block further calls from an inmate. Instead, it is the "77" component of the voice prompt that provides called parties with this ability. See Plaintiff's Statement Of Material Facts To Which There Exists No Genuine Issue at ¶ 2 (the voice prompt for domestic prepaid calls states, "This call is from a federal prison. This is a prepaid call. You will not be charged for this call. This call is from (insert name of inmate calling). Hang up to decline the call or to accept the call dial '5' now. To block future prepaid calls from this person, dial '77'") (emphasis added).

Plaintiffs are not challenging the lawfulness of the "77" procedure.

2.     While it should be apparent in light of the foregoing that the push "5" requirement has no relation to BOP's interest in protecting the general public from unwanted calls from inmates, Plaintiffs will be able to further prove this point with the deposition of Michael Atwood and several interrogatories. In particular, the deposition of Atwood would reveal that (i) it is the "77" component of the voice prompt, not the push "5" requirement, that gives call recipients the ability to deny/block further calls from an inmate; and (ii) the "77" component fully accommodates BOP's desire to provide called parties with the ability to instantly deny/block their number from inmate calling.

3.     Even if the Court were to conclude that the push "5" requirement is generally supported by BOP's protection of the general public theory, it is neither valid or rational to extend this same rationale to calls to courts and government agencies. As with calls to certain family members and friends, I am unable to communicate telephonically with courts and U.S. government agencies due to the push "5" requirement. See also Docket Entry 26-2 at ¶ 11. Courts and agencies of the United States government are, however, not a part of the "general public." Thus, with the deposition of Michael Atwood, I will be able to prove that (i) entities of the United States government have an interest in receiving calls from inmates like other members of the citizenry; (ii) BOP did not intend to prevent telephonic communication between inmates and the U.S.

2

government with the push "5" requirement; and (iii) there is no valid, rational connection between a legitimate governmental interest and the push "5" requirement as applied to prepaid calls to the United States government.

4.    I concede that I have alternative means of exercising my First Amendment rights in lieu of making telephone calls.

5.    Assuming, <u>arguendo</u>, the push "5" requirement was supported by BOP's protection of the "general public" theory, accommodation of my right to make calls to family, friends, courts, U.S. government agencies, and other numbers that are answered by an Automated Telephone Answering System (ATAS) would not unduly burden correctional officers, inmates, or prison resources. BOP claims that it would have to return to its previous system of providing written notification to each individual an inmate placed on his or her permitted telephone list, resulting in "considerable expense" and "a significant drain on BOP's resources," but this is not the case. Docket Entry 59 at 7.

6.    Prior to the implementation of the push "5" and "77" requirements, intended call recipients were notified via mail that their number had been placed on an inmate's telephone list. The purpose of the notification was to afford callers the opportunity to block their number from inmates. Written notification, however, **was not** a prerequisite to the inmate calling. Rather, once a number was added to an inmate's telephone list, the inmate was able to begin calling immediately. If someone who had their number placed on an inmate's telephone list did not wish to receive calls from an

inmate, they could <u>block</u> their number by notifying the institution in writing. However, if the person <u>wanted</u> to receive calls from an inmate, they need do nothing. Thus, the costs and burdens associated with the written notice procedure entailed (i) postage for the notification letter, (ii) manpower to send the notification letter, and (iii) manpower to record responses from callers who wanted their number blocked.

7.     Under the push "77" requirement, notification is accomplished through a voice prompt which gives called parties the option of blocking further calls to their number by pushing "77." Docket Entry 26-2 ¶ 9. Additionally, call recipients may choose to decline a call, without blocking their number, by simply hanging up. The push "5" requirement, on the other hand, does not affect a callers' ability to deny/block inmates from calling. Instead, it deals with the <u>acceptance</u> of calls from inmates.

8.     BOP could accommodate the Plaintiff's request to place domestic prepaid calls absent the push "5" requirement without unduly burdening its staff or resources. For instance, the voice prompt for domestic prepaid calls could be changed to say, "This call is from a federal prison. This is a prepaid call. You will not be charged for this call. This call is from (<u>insert name of inmate calling</u>). Hang up to decline the call. To block future prepaid calls from this person dial "77." Othwerwise, this call will be connected in five seconds." Under this revised procedure, a called party's ability to deny/block calls remains unchanged. The only difference is the elimination of the push "5" requirement in

4

favor of the "otherwise, this call will be connected in five seconds" procedure. While self-explanatory, the called party and the inmate would be automatically connected in five seconds after the "77" announcement if the call recipient does not hang up or block their number by pushing "77."

9.       Utilization of the above procedure in lieu of the push "5" requirement would not require BOP to revert to its prior written notification procedures, would not require any substantive change to the BOP's Inmate Telephone System, and could be done at de minimis cost to the BOP. Foremost, though, use of this revised procedure would retain BOP's ability to both "prevent unwanted calls from inmates to the general public and expedite the process by which a recipient of an inmate's call may prevent an inmate from making further calls to that number." Docket Entry 59 at 5. In fact, the deposition of Michael Atwood along with several interrogatories propounded on BOP would confirm each of these things.

**Count Eleven**

10.      During 2004, I was an inmate incarcerated at the low security Federal Correctional Institution (FCI) in Beaumont, Texas. For Passover that year, food and other items were purchased from a Kosher Cajun Deli in Louisiana. To the best of my knowledge, these items were purchased by the Food Service Department. After Passover was over, I recall there being some controversy over whether too much money had been spent on the Passover meal in contravention of the BOP's purported "equity" formula. In particular, the cost of the items from Kosher Cajun Deli exceeded $1,000, over the maximum $200 or $300 limit

5

afforded to each faith group for their ceremonial meal. I recall there being an effort by Religious Services staff in 2005 to cover up the purchase of these items from Kosher Cajun Deli in anticipation of a Program Review of the Religious Services Department, an audit performed by BOP every three years. To the best of my recollection, Chaplain Wantanabe was involved with the Passover ceremonial meal in 2004 and aware of the controversy that resulted afterwards.

**Count Fourteen**

11.    I having standing to raise my three challenges to the BOP's failure to comply with the Freedom of Information Act's (FOIA) so-called e-amendments. First, with respect to the BOP's failure to make available the thirteen categories of records listed in Plaintiff's Memorandum In Support of Plaintiff's Motion for Summary Judgment at 23-24, I have standing to seek the availability of these records via computer telecommunication means by virtue of BOP's failure to comply with FOIA. However, if some tangible harm were required, BOP's failure to disclose these records via computer telecommuncation means has cost/will continue to cost me monies for the search and duplication of records because I have no choice but to submit a request for these records under 5 U.S.C. § 552(a)(3)(A). I would not have to pay these fees if this information was already available via computer telecommuncation means as required by FOIA. Moreover, whether I will be able to access this information in electronic form while incarcerated is not so clear. At my last institution, FPC Jesup, I was permitted to review information obtained under FOIA in

6

electronic format on a computer. Furthermore, even if I may not be able access this information via computer telecommuncation means directly, my mother has agreed to access, print, and send me these records from the BOP's website.

12.    I also have standing to assert my challenge to BOP's failure to maintain its records created on a computer in electronic form. This is because I am subjected to increased fees for responding to requests for records in electronic format. Currently, when I make a request for information in electronic form, BOP must convert its paper records into electronic format by scanning each piece of paper. If BOP would retain an electronic copy of its records that it creates on a computer, though, I would not have to pay additional fees for the conversion of paper records into electronic format.

13.    Finally, I have standing to raise my challenge to BOP's failure to undertake "reasonable efforts" to maintain all its other records in electronic form based on the same reason provided in paragraph 12 above.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. 28 U.S.C. § 1746.

Signed this 14th day of December, 2007.

Brandon Sample

<u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was served this ___17th___ day of December, 2007, via first-class mail, postage prepaid, on:

Christopher B. Harwood
Assistant U.S. Attorney
555 Fourth Street, N.W.
Washington, DC 20530

Bernard Shaw #59469-004
Federal Satellite Low
2680 Highway 301 South
Jesup, Georgia 31599

Brandon Sample