UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Brandon Sample, *et. al.*,                    )
                                              )
                Plaintiff,                    )
                                              )
        v.                                    )        Civil Action No. 06-cv-715
                                              )
Bureau of Prisons, *et al.*,                  )
                                              )
                Defendants.                   )
_____           )

## AMENDED DECLARATION OF MICHAEL ATWOOD

I, Michael Atwood, hereby declare and state the following:

1.      I am currently employed by the Federal Bureau of Prisons of the United States

Department of Justice as Chief of the Trust Fund Branch.  My business office is located at the

Central Office in Washington, D.C.  I have held this position since June 1991.  Prior to that time,

I served as Supervisor of Computer Specialists from May 1989.

2.      As the Chief of the Trust Fund Branch, I have primary responsibility for

management and oversight of the Inmate Commissary Fund and the programs operated from the

Commissary Fund, including the Inmate Telephone System (ITS).

3.      The statements in this declaration are based upon my personal knowledge, belief

and experience, and upon information made available to me in the course of my official duties.

4.      Pursuant to 28 C.F.R. § 540.100(a), the BOP is authorized to implement and

manage a telephone system for inmates in federal prisons and impose limitations consistent with

the Bureau's correctional management responsibilities.  One aspect of ITS is the "Push 5"

requirement.  The "Push 5" requirement governs acceptance of incoming calls from inmates and

it's purpose is to protect the public from unwanted and potentially harassing and intrusive contact with inmates.

5.     When an inmate makes a call, the call recipient is informed that the call is coming from a federal prison and the name of the inmate is provided. Call recipients are informed that the call is pre-paid and they will not be charged for the call. If the call recipient does not wish to accept the call he/she may hang up and the call will be disconnected. The only means of accepting a call from an inmate is for the call recipient to push the number "5" on his or her telephone. The inmate will then be connected and the call may commence. To block future calls, the call recipient has the option of pushing the number "7" on their telephone. All future calls from the inmate will then be blocked.

6.     I am aware of Plaintiff's suggestion that the BOP remove the "Push 5" requirement and instead provide a five second delay after which a call would be connected if no negative response is given. Implementing this procedure would defeat the BOP's goal of protecting the public from unwanted and potentially harassing contact with inmates.

7.     First, a five second delay would allow inmates to leave harassing and threatening messages on voice mails. Second, when going through an automated switchboard, inmates would have the ability to input an extension (after the five second delay) and then contact persons in the general public without their consent to communicate. Third, after the five second delay, an inmate could have unfettered access to an automated voice mail system, which would present the inmate with the opportunity to commit remote toll fraud. Remote toll fraud is the fraudulent, illegal use of a company's telecommunications system by a third party from a remote location. A party who successful commits remote toll fraud is able to make a long distance call in a way that

2

he or she is not billed for the call.  For example, a common scam involves conning employees in businesses that use private branch exchanges.  A private branch exchange is a telephone exchange that serves a particular business or office, as opposed to one that a common carrier or telephone company operates for many businesses or for the general public.  Through a private branch exchange, an inmate is transferred to an employee who has no way of knowing the call is from an inmate.  The inmate can then con the employee into transferring him or her to an outside toll number, a technique known as social engineering.  The call would be billed to the business, and the business's phone number rather than the inmate's phone number.  The BOP houses inmates who were convicted of computer and telephone fraud for committing such scams.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __4__th day of January 2008 in Washington, D.C.

Michael Atwood

Bureau of Prisons Trust Fund Branch

3

Linda Smith - Atwood Declaration.wpd

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

Brandon Sample, *et. al.*,                    )
                                              )
                    Plaintiff,          )     )
                                              )
            v.                                )      Civil Action No. 06-cv-715
                                              )
Bureau of Prisons, *et al.*,                  )
                                              )
                    Defendants..              )
                                              )

## DECLARATION OF MICHAEL ATWOOD

I, Michael Atwood, hereby declare and state the following:

1.      I am currently employed by the Federal Bureau of Prisons of the United States Department of Justice as Chief of the Trust Fund Branch. My business office is located at the Central Office in Washington, D.C. I have held this position since June 1991. Prior to that time, I served as Supervisor of Computer Specialists from May 1989.

2.      As the Chief of the Trust Fund Branch, I have primary responsibility for management and oversight of the Inmate Commissary Fund and the programs operated from the Commissary Fund, including the Inmate Telephone System (ITS).

3.      The statements in this declaration are based upon my personal knowledge, belief and experience, and upon information made available to me in the course of my official duties.

4.      Pursuant to 28 C.F.R. § 540.100(a), the BOP is authorized to implement and manage a telephone system for inmates in federal prisons and impose limitations consistent with the Bureau's correctional management responsibilities. One aspect of the Inmate Telephone System ("ITS") is the "Push 5" requirement. When an inmate makes a call, the call recipient, through a series of voice prompts, may deny and/or block further telephone calls from the inmate

1

Linda Smith - Atwood Declaration.wpd                                                                    Page 2

through their telephone. The only means of accepting a call from an inmate is for the call

recipient to push the number "5" on their telephone. The inmate will then be connected and the

call may commence. The purpose of the "Push 5" requirement is to prevent unwanted calls from

inmates and to expedite the process by which a call recipient may prevent an inmate from making

further calls to that number. Requiring called party acceptance of a call is the industry standard

for parties receiving inmate calls and has been approved by the FCC and 47 C.F.R. § 64.710(3).

5.       The "Push 5" requirement is only for domestic telephone calls made in the United

States and its territories. Although call recipients in foreign countries were previously required

to push "5" on their telephones to receive an inmate call, that procedure is no longer applicable to

international calls. The reasons behind this change included language barriers and a lack of

compatibility with foreign telephone systems. Inmates are subject to the same national calling

restrictions as the general public.

6.       Inmates wishing to discuss legal matters with an attorney may make legal calls

without using the ITS. These calls would not require the "Push 5" acceptance, therefore, not

limiting access to offices utilizing a switchboard.

7.       Removing the "Push 5" procedure would be a drain on BOP resources and impose

a substantial cost burden. Moreover, the requirement allows the BOP to continue protecting the

public from unwanted and potentially intrusive phone calls from federal inmates. Previously, the

BOP provided written notification to civilians placed on an inmate telephone list. These civilians

could, in response, accept or decline phone contact with an inmate. However, the BOP now has

over two million phone numbers on record agency-wide. Providing written notification to every

person placed on these lists would impose a considerable financial burden and affect the

allocation of staff resources.

8.       Another responsibility of managing the ITS is to ensure that the system operates

within the boundaries of budgetary allocations. Therefore, telephone calling rates must be

periodically evaluated and revised on an as-needed basis to keep the ITS self-sustaining. The

Linda Smith - Atwood Declaration.wpd

BOP previously used a banded system that set a per minute charge based on the distance between the facility where the inmate was housed to the location of the telephone number called. The BOP moved away from this system in 1998 to implement a standard calling rate. With the institution of the standard price, the rates must be periodically revised to ensure that the ITS is not exceeding its budgetary limitations.

9.      Pursuant to 28 C.F.R. § 540.100(a), the BOP has promulgated an internal policy that is consistent with its statutory authority to implement restrictions on the use of telephones by inmates in federal prisons. Pursuant to Program Statement 5264.007(10)(d)(1), the BOP may limit the length of time inmates spend in making telephone calls so as to reduce staff and financial resources involved in monitoring inmate telephone calls. Inmates were permitted to make unlimited prepaid calls until April, 2001. At that time, the BOP implemented 300 minute monthly calling time limits, with 400 minute limits instituted in November and December.

10.      Pursuant to 31 U.S.C. § 1321, the BOP operates and manages prison commissaries. Program Statement 4500.04, Trust Fund/Deposit Fund Manual outlines how prices are set in the commissary. First, cost price is computed. Cost price includes transportation charges except for Special Purpose Order items. The cost is divided per case by the number of sellable units in the case, extended to two decimal places. Sellable unit is defined as the smallest individual unit sold in the commissary. Certain items are exempt from mark-up, as reflected in the Program Statement. Second, cost price is computed into the selling price using a set mark-up formula.

11.      BOP executive staff decided to increase the commissary mark-ups effective March 1, 2002, to ensure the commissary operated within the boundaries of budgetary restraints. The increase was achieved by changing the mark-up formula for general items. The change implemented a roughly 5% increase in commissary prices.

12.      Prior to March 1, 2002, the BOP mark-up formula to determine the selling price for items other than those containing tobacco was to divide the cost price by .8 (or 4/5) and round

Linda Smith - Atwood Declaration.wpd

the result to the next highest nickel. This created a roughly 25% mark-up from the cost price.

13.    Since March 1, 2002, the current mark-up formula for determining the selling price of commissary items is to multiply the cost price by 1.3 and round to the next highest nickel. The new mark-up formula results roughly in a 30% mark-up from the cost price.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 14 th day of November 2007 in Washington, D.C.

Michael Atwood
Bureau of Prisons Trust Fund Branch

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRANDON SAMPLE, ET AL.,                )

v.                                     )        06-715 (PLF)

FEDERAL BUREAU OF PRISONS, ET AL.      )

### DECLARATION OF BRANDON SAMPLE

    I the undersigned, Brandon Sample, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

**Request For Admissions**

1.    Attached as Exhibit 1 is a true and correct copy of the Plaintiffs' Rule 36 Request for Admissions served August 10, 2006, on the Bureau of Prisons ("BOP") via certified mail, return receipt, number 7005-2570-0001-7392-9346.  The Request for Admissions were signed for by a "J. Dixon" on August 15, 2007.  See Exhibit 2.

**Count One**

2.    The BOP allows inmates to make domestic and international telephone calls to approved numbers over its Inmate Telephone System II ("ITS II"), now renamed TRUFONE.  All calls over the ITS II are subject to monitoring and are recorded.  With the exception of 1-900 and 1-800 numbers, there are, ordinarily, no restrictions on what numbers may be placed on an inmate's approved telephone list.  Calls over the ITS are limited to 15 minutes in duration and may be prepaid by the inmate.

3.    I have attempted to make domestic prepaid calls over the ITS II to clerks of court, businesses, friends, family members,

government agencies, and other called parties who utilize an Automated Telephone Answering System ("ATAS"). ATAS' are, however, incapable of pushing "5" to accept my calls. As a result, I been deprived of the opportunity to communicate telephonically with domestic prepaid called parties who use an ATAS. As a result of this restriction, I have been unable to speak with officials from (1) the Dept. of Justice Inspector General's Office regarding misconduct by prison officials; (2) the Office of Management and Budget concerning the BOP's failure to implement provisions of the E-Government Act of 2002; and (3) the BOP's FOIA section regarding my FOIA requests.

4.    While I retain the ability to communicate with government agencies via correspondence, I must wait months before receiving a response, and sometimes I do not receive a response at all. BOP realizes that written correspondence is largely ineffectual in communicating with federal government agencies and uses the push "5" requirement to effectively censor the communications of prisoners, like myself, who desire to bring about reform within the federal prison system.

5.    What really points up the absurdity of this restriction is there is no push "5" requirement for international calls over the ITS. Rather, all international calls ring straight through. I have placed calls over the ITS to numbers in Iraq, North Korea, and the United Arab Emirates. It does not make sense that I can place direct dial calls to countries that are centers of terrorist activity and/or are apart of the so-called "Axis of Evil," but I cannot make direct dial calls domestically, especially to agencies of the United States government.

6. Furthermore, prior to the implementation of the ITS II, there was no push "5" requirement. Instead, all calls over ITS I rung straight through. ITS I was in place over five years before it was replaced with ITS II. During this time, no problems were caused by the absence of the push "5" requirement. The imposition of the push "5" requirement with ITS II was unexpected and continues, to this day, to impose hardship on the undersigned in communicating with domestic called parties.

7. I recognize BOP's argument that the push "5" requirement helps protect the public from unwanted calls from inmates. But this is simply not the case. The push "5" requirement does not enable a call recipient to reject or block a call from an inmate. Instead, it is a call recipient's ability to hang up or push "7" that affords these protections. Amended Atwood Decl. ¶ 5.

8. According to Mr. Atwood, inmates would leave harassing or threatening messages on voicemail without the push "5" requirement. Amended Atwood Decl. ¶ 7. While this may be a possibility, there are other protections in place to ensure that this kind of behavior does not occur. For instance, all calls over the ITS are monitored and recorded. If an inmate were to leave a harassing or threatening message, they would be subject to inmate discipline, and possibly criminal charges as well. See 18 U.S.C. § 875.

9. Next, Mr. Atwood claims that without the push "5" requirement, "when going through an automated switchboard, inmates would have the ability to input an extension ... and

3

then contact persons in the general public without their consent to communicate." Amended Atwood Decl. ¶ 7. Once again, the potential for something like this occur is there, but it already exists with the push "5" requirement. For instance, I have made several calls to numbers that are answered by a switchboard. After the operator pushes "5," I give the extension or name of the person I'm trying to reach and am transferred. In such instances, what extension or name I provide to the operator is entirely up to me. If I wanted, I could ask to be transferred to someone other than the person I listed on my telephone list. The push "5" requirement does not protect against this kind of behavior. Rather, it is the possibility that an inmate might lose their phone privileges or receive other inmate discipline that keeps this from occurring.

10. Mr. Atwood also claims that the push "5" requirement helps prevent "remote toll fraud." But the push "5" requirement does no such thing. As explained above, existing procedures already permit an inmate to communicate to a switchboard operator the party or extension they are trying to reach. If the extension or party's line is answered by voicemail, an inmate can hit "0" and be transferred back to the operator. When the call comes back to the operator, the operator does not know that the call originated from a federal prison. An inmate could then attempt to con the operator into giving them access to an outside line. None of this is likely to occur, though, for several reasons. One, an announcement stating "this call is from a federal prison" is intermittently played during each call. Two, each

4

call is recorded and monitored. Three, doing something like this is almost like three-way calling. BOP has software that detects unauthorized three-way calling. Frequently, an inmate's call will be disconnected, mid-call, if a three-way is attempted. The same would occur with an inmate trying to commit remote toll fraud. Four, each call is limited to 15 minutes in duration. Five, there is no benefit to an inmate trying to commit remote toll fraud as they would still be paying .23¢ a minute as long as his or her call is connected.

11. In fact, the best illustration why Mr. Atwood's concerns are irrational, arbitrary, and exaggerated is the total lack of a push "5" requirement for international calls. Despite the absence of a push "5" requirement for international calls, there has not been a problem with inmates leaving harassing voicemail messages, inmates trying to be transferred to unauthorized individuals, or inmates committing remote toll fraud. Furthermore, none of these things were a problem before the implementation of ITS II when both domestic and international calls were direct dial. With the deposition of Michael Atwood, interrogatories, and document requests, I will be able to prove each of the things described in ¶¶ 7-11 herein.

12. It is even more difficult to apply Mr. Atwood's "concerns" to calls to courts and government agencies. Entities of the federal government have a duty to be responsive to the citizenry, which includes federal prisoners. With the deposition of Atwood and service of interrogatories, I will be able to prove that the push "5" requirement as applied to calls

5

to government agencies is not supported by (i) an important or substantial government interest unrelated to the suppression of expression; (ii) a legitimate penological interest; (iii) the restriction is greater than is necessary or essential to the protection of any particular governmental interest that may be involved; and (iv) accommodation of my request to place direct dial calls to government agencies would not unduly burden correctional staff, resources, or inmates, and can be accommodated at <u>de minimis</u> cost to the BOP.

13. In particular, the deposition of Atwood will reveal, among other things, that BOP is using the push "5" requirement to inhibit prisoner communication with government agencies. BOP is aware that in this day and age, government agencies are more responsive to individual needs, concerns, and allegations of misconduct if communicated telephonically. However, BOP does not want prying eyes into its business. Further, the deposition of Atwood will reveal that BOP could accommodate my request to make direct dial calls to government agencies by merely eliminating the push "5" requirement for such calls. Since all such calls would be placed to government entities, there would be no need for BOP to revert to its prior written notice procedures as BOP has no legitimate governmental interest in restricting calls by prisoners to government agencies. Lastly, there would be little, if any, expense associated with permitting direct dial calls by prisoners to government agencies.

6

14. As for calls to the general public, the deposition of Atwood will reveal that the push "5" requirement is greater than necessary or essential to the protection of the general public from unwanted calls from inmates. For instance, the Atwood deposition will reveal that BOP could accommodate my desire to make direct dial calls domestically by either (i) reverting to its prior written notification procedures, or (ii) implementing an inmate do-not-call registry similar to the do-not-call registry used by the FTC to curtail unwanted calls from telemarketers to the general public.

15. As for the first method of accommodation, the deposition of Atwood and service of interrogatories will show that there would be no need to submit some 2,000,000 written notices to all approved numbers in BOP's ITS system as numbers belonging to members of an inmate's immediately family and those persons on the inmate's visiting list are exempt from the written notice requirements. See 28 C.F.R. § 540.101(a)(2). This would leave only a handful of numbers that would require written notice. And then, the written notice requirements could be waived in many of these cases if the call recipient has already been accepting calls from the inmate.

16. With respect to the costs associated with reverting to BOP's prior written notice procedures, I submit that the deposition of Atwood, service of interrogatories, and document requests will reveal that the written notice procedure is less expensive than BOP's push "5" requirement. This is because the costs associated with the written notice procedure entail only a

7

one-time postage cost of sending the notice and staff time to process letters from call recipients that do not wish to receive calls from inmates (which are very few). However, with the push "5" requirement, BOP is charged each time a call is answered, whether by voicemail, an answering machine, or the call recipient. The requested discovery will show that the cost of playing the push "5" announcement over and over greatly exceeds the negligible costs associated with the written notification procedures.

17. The other suggested alternative, the creation of an inmate do-not-call registry, would equally ensure the protection of the general public from unwanted calls from inmates. In fact, this alternative would allow international call recipients to also block their number from inmate calling, a feature currently unavailable with the push "5" requirement. Additionally, discovery in the form of depositions, interrogatories, and document requests to the BOP and the FTC will show that this alternative could be implemented at equal or less cost than the push "5" requirement.

I declare under penalty of perjury that the foregoing is true and correct to best of my information and belief. 28 U.S.C. § 1746.


Signed this 18th day of February, 2008.


Brandon Sample

8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

BRANDON C. SAMPLE, et al.,        §

v.                                §       Civil No. 06-715(PLF)

FEDERAL BUREAU OF PRISONS.        §

### RULE 36 REQUEST FOR ADMISSIONS

Plaintiffs Brandon Sample and Bernard Shaw ("the plaintiffs") request defendant Federal Bureau of Prisons ("BOP"), within 30 days after service of this request, make the following admissions for the purpose of this action only and subject to all pertinent objections to admissibility which may be interposed at the trial:

1.    That each of the following statements is true.

(a)    The plainitffs have exhausted their available administrative remedies for each allegation presented in the Original Complaint. This was accomplished the plaintiffs by filing BP-9s, BP-10s, and BP-11s through the BOP's Administrative Remedy Program.

(b)    The actions complained about in Counts One through Four of the plaintiff's original complaint occurred on or after May 1, 2002.

(c)    The BOP allows inmates to make domestic and international telephone calls to approved numbers over its Inmate Telephone System ("ITS," which refers to ITS I, II, or III as appropriate).

Exhibit 1

(d)    When a prepaid domestic U.S. call is placed by an inmate, the called party will not be connected with the inmate unless they push "5."

(e)    Prepaid international calls over the ITS system are treated differently than prepaid domestic U.S. calls. Specifically, all international calls are direct dial. "Direct dial" means the call rings straight through to the called party without any voice prompt announcing that the call is from a federal prison, or requirement that that the called party push "5" before the call is connected.

(f)    International calls over the ITS system pose a greater risk to the security of BOP institutions than do domestic U.S. prepaid calls.

(g)    The plaintiffs have attempted to make domestic U.S. prepaid calls over the ITS system to called parties who utilize an Automated Telephone Answering System ("ATAS"), but been unsuccesful because such systems are incapable of pushing "5."

(h)    The push "5" requirement, or any other similar restriction on domestic U.S. prepaid calls, violates the plaintiffs First Amendment rights because there is no legitimate penological reason in requiring prepaid domestic U.S. called parties to push "5" before their calls are connected.

(i)    Moreover, upon implementation of the ITS system, there was no push "5" requirement for domestic U.S. prepaid calls. Thus, the subsequent creation and implementation of

the push "5" requirement is not only arbitrary and capricious, but, also, is a significant departure from established and consistent BOP practice such that it was required to be promulgated with notice-and-comment rulemaking before its adoption.

(j)    The cost per minute increases described in Count Two of the plaintiff's Original Complaint were substantive rules first requiring notice-and-comment rulemaking before their adoption.

(k)    The plaintiff's are entitled to $10,000 from the BOP as a result of overcharges from the unlawful cost per minute increases described in Count Two of the plaintiff's Original Complaint.

(l)    For the reasons set forth in Count Three of the plaintiff's Original Complaint, the BOP's 300 and 400 minute per month calling restrictions are invalid because they were not submitted for notice-and-comment rulemaking before their adoption.

(m)    For the reasons set forth in Count Four of the plaintiff's Original Complaint, the BOP's new commissary markup formula is invalid because it was not submitted for notice-and-comment rulemaking before its adoption.

(n)    As a result of the unlawful markup formula described in Court Four of the plaintiff's Original Complaint, the BOP is obligated to return $10,000 to the plaintiffs.

(o)    On March 8, 2004, the BOP received a FOIA request from plaintiff Sample requesting a copy of inmate Richard Painter's PSI.    Included with the request was an authorization executed by Painter permitting plaintiff Sample to obtain records about him from any component of the Department of Justice.    The BOP did not respond to this request.

(p)    There is no FOIA exemption or other lawful reason for denying plaintiff Sample access to inspect a copy of inmate Painter's PSI.

Signed: _____
                BRANDON SAMPLE

_____
BERNARD SHAW

## CERTIFICATE OF SERVICE

I declare under penalty of perjury that a true and correct copy of the foregoing was provided to prison officials this 10th day of August, 2006, first-class postage affixed, for delivery, via certified mail return receipt requested # 7005-2570-0001-7392-9346, to the following:

Federal Bureau of Prisons
320 First St. N.W.
Washington, DC 20534

_____
BRANDON SAMPLE

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired. ■ Print your name and address on the reverse so that we can return the card to you. ■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature X ___ J. Dixon ___ ☐ Agent ☐ Addressee B. Received by (*Printed Name*)   C. Date of Delivery |
| 1. Article Addressed to: Federal Bureau of Prisons 320 First St., NW Washington, DC 20534 Re: 06-715 (PLF) Request For Admissions | D. Is delivery address different from item 1? ☐ Yes If YES, enter delivery address below: ☐ No |
| | 3. Service Type ☐ Certified Mail  ☐ Express Mail ☐ Registered  ☐ Return Receipt for Merchandise ☐ Insured Mail  ☐ C.O.D. |
| | 4. Restricted Delivery? (*Extra Fee*)  ☐ Yes |
| 2. Article Number (*Transfer from service label*)  7005 2570 0001 7352 9346 | |

PS Form 3811, February 2004       Domestic Return Receipt       102595-02-M-1540

Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRANDON SAMPLE, et al.,              )

v.                                   )    No. 06-715 (PLF)

FEDERAL BUREAU OF PRISONS, et al.    )

### DECLARATION OF BERNARD SHAW

I the undersigned, Bernard Shaw ("Shaw"), declare under penalty of perjury that the following is true and correct to the best of my knowledge:

**Count One**

1.  I have attempted to make domestic prepaid calls over the ITS II to clerks of court, businesses, friends, family members, and other called parties who utilize an automated telephone answering system ("ATAS"). ATAS' are, however, incapable of pushing "5" to accept my calls. As a result, I have been deprived of the opportunity to communicate telephonically with domestic U.S prepaid called parties who use an ATAS.

2.  I recently placed calls over the ITS II to numbers in Iraq, North Korea, and the United Arab Emirates. There is no push "5" requirement for such calls.

3.  The push "5" requirement imposes undue hardship on the undersigned in communicating with domestic called parties.

**Count Two**

4.  The BOP's gradual increase in long distance rates from .15¢ a minute to .23¢ a minute has cost me at least an additional $288 annually. This is a substantial sum for an incarcerated person.

**Count Three**

5.    The 300 and 400 minute restrictions substantially affect me in that they inhibit my ability to communicate with family and friends.    For instance, I do not have enough phone time to keep in touch with all of my family and friends.    This results in further strain on already strained relationships.

**Count Four**

6.    The BOP's change in markup formula has cost me hundreds, if not thousands, of additional dollars.

I declare under penalty of perjury that the foregoing is true and correct.    28 U.S.C. § 1746.

Signed this __30th__ day of July, 2007.


_____
Bernard Shaw

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRANDON SAMPLE, et al.,                    )

v.                                          )        No. 06-715 (PLF)

FEDERAL BUREAU OF PRISONS, et al.     )

### DECLARATION OF PERRY ORLANDO

    I the undersigned, Perry Orlando, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.   I am currently incarcerated at the Federal Satellite Low facility in Jesup, Georgia. I have personal knowledge regarding the negative effects of the so-called "push-5" requirement and monthly 300 minute restriction at issue in this case.

2.   I am unable to communicate telephonically with several individuals over the Inmate Telephone System (ITS) as a result of the "push-5" requirement. Specifically, I cannot call my friend, Larry France, because in order to connect to him you must dial "1," or the call is automatically transferred to voicemail. I also cannot call my brother, John Orlando, or my friend, Jim Luper, at work because the computer that answers the phone requires the caller to enter an extension.

3.   Aside from the "push-5" requirement, the monthly 300 minute restriction is also burdensome. For instance, as a result of the 300 minute restriction, I am unable to call any of my friends because all my time on the phone is dedicated to maintaining a loving relationship with my fiancee, Lorraine.

And since I have no minutes to call anyone else, I am forced to relay messages to my family through my fiancee.  My family, in turn, relays messages to her for me.  This haphazard flow of information was the way I recently found out about the death of a friend, and the mother of a different friend.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  28 U.S.C. § 1746.

Signed this 25TH day of July, 2007.


PERRY ORLANDO

2