UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BRANDON C. SAMPLE, et al.,          )
                                    )
        Plaintiffs,                 )
                                    )
        v.                          )       Civil Action 06-0715 (PLF)
                                    )
FEDERAL BUREAU OF PRISONS, et al.,  )
                                    )
        Defendants.                 )
_____)

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT ON COUNT ONE OF PLAINTIFFS' SECOND AMENDED COMPLAINT AND OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendants, through counsel, respectfully move this Court for summary judgment as to Count One of Plaintiffs' Second Amended Complaint. In Count One, Plaintiffs challenge the "push 5" requirement of the Bureau of Prison's inmate telephone system. Plaintiffs argue that the "push 5" requirement is unlawful for two reasons: (1) it was enacted without notice-and-comment rulemaking in violation of the Administrative Procedure Act; and (2) it violates their First Amendment rights. For the reasons set forth in the accompanying memorandum of law in support of Defendants' Cross-Motion for Summary Judgment and in opposition to Plaintiffs' Amended Motion for Summary Judgment, both of Plaintiffs' arguments fail. Consequently, Defendants respectfully request that this Court: (1) grant their Cross-Motion for Summary Judgment; (2) deny Plaintiffs' Amended Motion for Summary Judgment; and (3) dismiss Count One of Plaintiffs' Second Amended Complaint with prejudice.

Submitted herewith are: (1) Defendants' Statement of Material Facts Not in Genuine Dispute; (2) Defendants' Memorandum of Law in Support of Their Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Amended Motion for Summary Judgment; (3) a proposed order granting Defendants' Cross-Motion for Summary Judgment and denying Plaintiffs' Amended Motion for Summary Judgment; (4) the March 24, 2008 Declaration of Dawn Harrison; and (5) Defendants' Response to Plaintiffs' Amended Statement of Material Facts.

Dated: March 24, 2008                          Respectfully submitted,


                                               _____/s/_____
                                               JEFFREY A. TAYLOR, D.C. BAR # 498610
                                               United States Attorney


                                               _____/s/_____
                                               RUDOLPH CONTRERAS, D.C. BAR # 434122
                                               Assistant United States Attorney


                                               _____/s/_____
                                               CHRISTOPHER B. HARWOOD
                                               Assistant United States Attorney
                                               555 Fourth St., N.W.
                                               Washington, D.C. 20530
                                               Phone: (202) 307-0372
                                               Fax: (202) 514-8780
                                               Christopher.Harwood@usdoj.gov


**Of Counsel:**

Wanda Hunt, Esq.
Delaine Martin Hill, Esq.
Bureau of Prisons
Washington, D.C.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
BRANDON C. SAMPLE, et al.,              )
                                        )
            Plaintiffs,                 )
                                        )
            v.                          )          Civil Action 06-0715 (PLF)
                                        )
FEDERAL BUREAU OF PRISONS, et al.,      )
                                        )
            Defendants.                 )
_____)

## DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

Pursuant to Local Civil Rule 7(h), Defendants respectfully submit this statement of material facts as to which there is no genuine dispute.

1.      Prior to the implementation of the "push 5" requirement, each inmate was permitted to call only those (approximately 30) telephone numbers listed on his official telephone list. (Harrison Decl. ¶4)[1]; see 28 C.F.R. § 540.101(a).  An inmate was permitted to place a telephone number on his official telephone list so long as:  (1) he certified that the number belonged to a person who was agreeable to receiving his calls; (2) he certified that any calls to the number would be made for a legitimate purpose; and (3) the warden did not have cause to preclude him from calling the number.  (Id.)

2.      Prior to the implementation of the "push 5" requirement, to protect the public from unwanted and unexpected telephone contact with inmates, the Bureau of Prisons (the "BOP") would notify in writing each person whose telephone number appeared on an inmate's official

_____
[1] Citations in the form "(Harrison Decl. ¶__)" refer to the March 24, 2008 Declaration of Dawn Harrison, which is attached hereto.

telephone list and who was not (1) part of the inmate's immediate family or (2) on the inmate's approved visitor list.  (Harrison Decl. ¶5); <u>see</u> 28 C.F.R. § 540.101(a)(2).

3.      Prior to the implementation of the "push 5" requirement, each year, the BOP mailed out hundreds of thousands of letters informing members of the public that their telephone numbers appeared on inmate telephone lists.  (<u>See</u> Harrison Decl. ¶5.)  Those letters also informed each individual to whom they were sent that the individual could have his or her telephone number removed from a particular inmate's official telephone list if the individual sent a written request to that effect to the BOP.  (<u>See</u> <u>id.</u>)  Each year, the BOP received—and had to effectuate—countless requests from members of the public to have their numbers removed from inmate telephone lists.  (<u>Id.</u>)

4.      The current inmate telephone system—which includes the "push 5" requirement—operates as follows:  When an inmate makes a telephone call, the recipient of the call, upon picking up the receiver, is immediately informed by a prerecorded message that the call is from a prison, that the call is prepaid and that the recipient will not be charged for the call.  (<u>Id.</u> at ¶6.)  The recipient is also told the name of the inmate making the call.  (<u>Id.</u>)  Finally, the recipient is told that he or she should hang up the phone to decline the call, dial "5" to accept the call and/or dial "7" to block future calls from the inmate making the call.  (<u>Id.</u>)

5.      Under the current inmate telephone system, the BOP is charged a minimal fee for each call placed by an inmate until the call is accepted or rejected by the call recipient.  (<u>Id.</u>)  Once the call recipient pushes "5," the inmate begins to pay for the call.  (<u>Id.</u>)  The costs that the BOP bears as a result of the "push 5" requirement are less than the costs it bore for telephone-related correspondence under the pre-"push 5" system.  (<u>Id.</u>)

6.      As a result of the implementation of the "push 5" requirement, the BOP no longer notifies members of the public when their telephone numbers appear on inmate telephone lists. (Id. at ¶7) Each inmate is still permitted to call only those (approximately 30) telephone numbers listed on his official telephone list. (Id.)

7.      The "push 5" requirement was enacted, in part, to protect the public from unwanted and potentially harassing and/or threatening telephone contact with inmates. (Id. at ¶¶6, 8.)

8.      The "push 5" requirement was also enacted, in part, to preserve prison resources. (Id. at ¶9.)

9.      The "push 5" requirement was also enacted, in part, to address inmate complaints about the pre-"push 5" telephone system. (Id. at ¶10.)

Dated: March 24, 2008                    Respectfully submitted,


                                         _____/s/_____
                                         JEFFREY A. TAYLOR, D.C. BAR # 498610
                                         United States Attorney


                                         _____/s/_____
                                         RUDOLPH CONTRERAS, D.C. BAR # 434122
                                         Assistant United States Attorney


                                         _____/s/_____
                                         CHRISTOPHER B. HARWOOD
                                         Assistant United States Attorney
                                         555 Fourth St., N.W.
                                         Washington, D.C.  20530
                                         Phone: (202) 307-0372
                                         Fax: (202) 514-8780
                                         Christopher.Harwood@usdoj.gov


**Of Counsel:**

Wanda Hunt, Esq.
Delaine Martin Hill, Esq.
Bureau of Prisons
Washington, D.C.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                            )
BRANDON C. SAMPLE, et al.,                  )
                                            )
        Plaintiffs,                         )
                                            )
            vi.                             )          Civil Action 06-0715 (PLF)
                                            )
FEDERAL BUREAU OF PRISONS, et al.,          )
                                            )
        Defendants.                         )
_____)

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR SUMMARY JUDGMENT**

In this lawsuit, Plaintiffs are challenging, inter alia, the "push 5" requirement of the Bureau of Prison's (the "BOP") inmate telephone system. (See Docket No. 22 ¶¶8-14; Docket No. 30 ¶1.) Plaintiffs argue that the "push 5" requirement is unlawful because: (1) it was enacted without notice-and-comment rulemaking in violation of the Administrative Procedure Act (the "APA"); and (2) it violates their First Amendment rights. Both of those arguments fail. As an initial matter, Plaintiffs lack standing to litigate both their APA and First Amendment challenges to the "push 5" requirement. Moreover, Plaintiffs' APA claim fails on the merits because the BOP was not required to engage in notice-and-comment rulemaking prior to enacting the "push 5" requirement. Plaintiffs' First Amendment claim also fails on the merits—the "push 5" requirement is plainly constitutional.

## BACKGROUND

### A.    The BOP's Inmate Telephone System Prior to the Implementation of the "Push 5" Requirement

Prior to the implementation of the "push 5" requirement, the BOP's inmate telephone system operated as follows:  Each inmate was permitted to call only those telephone numbers listed on his official telephone list.  (Harrison Decl. ¶4)[2]; see 28 C.F.R. § 540.101(a).  With limited exceptions, each inmate's official telephone list could include up to 30 telephone numbers.  See id.  An inmate was permitted to place a telephone number on his official telephone list so long as:  (1) he certified that the number belonged to a person who was agreeable to receiving his calls; (2) he certified that any calls to the number would be made for a legitimate purpose; and (3) the warden did not have cause to preclude him from calling the number.  (Harrison Decl. ¶4); see 28 C.F.R. § 540.101(a)(1)-(2).  As a general matter, "telephone numbers requested by an inmate [were] . . . placed on the inmate's telephone list."  28 C.F.R. § 540.101(a)(2).  In a given year, the BOP maintained approximately 100,000 official telephone lists.  (Harrison Decl. ¶5.)

To protect the public from unwanted and unexpected telephone contact with inmates, the BOP would notify in writing each person whose telephone number appeared on an inmate's official telephone list and who was not (1) part of the inmate's immediate family or (2) on the inmate's approved visitor list.  (Id.); see 28 C.F.R. § 540.101(a)(2).  Each year, the BOP mailed out hundreds of thousands of letters informing such persons that their telephone numbers appeared on inmate telephone lists.  (See Harrison Decl. ¶5.)  Those letters also informed each individual to whom they were sent that the individual could have his or her telephone number

_____

[2] Citations in the form "(Harrison Decl. ¶__)" refer to the March 24, 2008 Declaration of Dawn Harrison, which is attached hereto.

removed from a particular inmate's official telephone list if the individual sent a written request to that effect to the BOP.  (Id.); see 28 C.F.R. § 540.101(a)(2).  Each year, the BOP received—and had to process and effectuate—countless requests from members of the public to have their numbers removed from inmate telephone lists.  (Harrison Decl. ¶5.)

**B.    The BOP's Inmate Telephone System Subsequent to the Implementation of the "Push 5" Requirement**

The current inmate telephone system—which includes the "push 5" requirement—operates as follows:  When an inmate makes a telephone call, the recipient of the call, upon picking up the receiver, is immediately informed by a prerecorded message that the call is from a prison, that the call is prepaid and that the recipient will not be charged for the call.  (Harrison Decl. ¶6.)  The recipient is also told the name of the inmate making the call.  (Id.)  Finally, the recipient is told that he or she should hang up the phone to decline the call, dial "5" to accept the call and/or dial "7" to block future calls from the inmate making the call.  (Id.)  The BOP is charged a minimal fee for each call until the call is accepted or rejected by the recipient.[3]  (Id.)  Once a call recipient pushes "5," the inmate begins to pay for the call.  (Id.)

Under the current telephone system, inmates are still limited to calling only those approximately 30 telephone numbers that are listed on their official telephone lists.  (Id. at ¶7.)  However, the BOP no longer notifies members of the public (in writing or otherwise) when their telephone numbers appear on inmate telephone lists.  (Id.)  This is because, as discussed below, the "push 5" requirement obviates the need for the BOP to do so.

---

[3] The costs that the BOP bears as a result of the "push 5" requirement are less than the costs it bore for telephone-related correspondence under the pre-"push 5" system.  (Harrison Decl. ¶6.))

One of the primary purposes of the "push 5" requirement is "to protect the public from unwanted and potentially harassing and threatening telephone contact with inmates." (Id. at ¶6.) Prior to the enactment of the "push 5" requirement, inmates:

- had access to, and were thus able to leave harassing and threatening messages on, voicemail systems. (Id. at ¶8.) Indeed, prior to the implementation of the "push 5" requirement, the BOP received numerous complaints each year of inmates having left non-inmates inappropriate (and in some cases threatening) voicemail messages. (Id.)

- were able to call a number that used an automated switchboard, enter a party's extension and then speak directly with (and potentially harass and/or threaten) that party without anyone on the non-inmate's end of the line having consented to the call. (Id.) Prior to the enactment of the "push 5" requirement, the BOP received numerous complaints each year of inmates having made inappropriate statements to individuals to whom they gained telephone access through automated switchboards. (Id.)

The "push 5" requirement has made it essentially impossible for inmates to leave non-inmates inappropriate voicemail messages or make inappropriate use of automated switchboards. This is because with the "push 5" requirement, no call is connected unless a person on the non-inmate's end of the line affirmatively accepts the call. (See id. at ¶6.)

Another purpose of the "push 5" requirement is to preserve prison resources. (See id. at ¶9.) Prior to the implementation of the "push 5" requirement, to protect the public from unwanted telephone contact with inmates, prison officials would:

- notify in writing all persons whose telephone numbers appeared on an inmate's official telephone list and who were neither part of the inmate's immediate family nor already on the inmate's approved visitor list;

- provide each of those persons with the opportunity to make a written request to have his or her telephone number removed from the inmate's telephone list; and

- keep track of—and effectuate—each such request.

(Id.); see 28 C.F.R. § 540.101(a)(2). The "push 5" requirement has eliminated the need for prison officials to do any of the above. This is because, with the "push 5" requirement, an inmate cannot have any telephone contact whatsoever with a non-inmate unless the non-inmate

(or another non-inmate) affirmatively accepts the inmate's call.  (See Harrison Decl. ¶6.)  The "push 5" requirement, thus, preserves prison resources—it (1) saves the BOP the actual costs associated with telephone-related correspondence, and (2) permits prison officials to allocate resources to matters other than telephone-related correspondence.  (See id. at ¶9.)

Notably, the "push 5" requirement was enacted, in part, in direct response to inmate complaints about the pre-"push 5" telephone system.  (Id. at ¶10.)  Prior to the implementation of the "push 5" requirement, inmates were charged for telephone calls regardless of whether the calls were answered by live persons or voicemail systems.  (Id.)  Each year, the BOP received numerous complaints from inmates who were charged for calls that were answered by voicemail systems.  (Id.)  The "push 5" requirement addressed those complaints.  Under the "push 5" requirement, an inmate is charged for a call only after the recipient pushes "5" and accepts the call.  (Id.)

## STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[4]  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  Importantly, "[s]ummary judgment is not a disfavored procedural shortcut, but is an integral procedural tool which promotes the speedy and inexpensive resolution of every

_____

[4] "[T]he mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party."  Smith v. Jackson, No. 05-2042, 2008 WL 623230, at *9 (D.D.C. Mar. 10, 2008) (citing cases).

case." Smith v. Jackson, No. 05-2042, 2008 WL 623230, at *9 (D.D.C. Mar. 10, 2008) (internal

quotation marks omitted); see Celotex Corp., 477 U.S. at 327.

## ARGUMENT

Plaintiffs assert that the "push 5" requirement is invalid because it was instituted without

notice-and-comment rulemaking in violation of the APA, and because it violates their First

Amendment rights.  (Pls. Br. at 4-9.)[5]  As stated above and demonstrated below, those arguments

are unavailing.  As an initial matter, Plaintiffs lack standing to litigate both their APA and First

Amendment challenges to the "push 5" requirement.  Moreover, (1) the BOP was not obligated

to engage in notice-and-comment rulemaking prior to enacting the "push 5" requirement; and

(2) the "push 5" requirement plainly passes First Amendment scrutiny.

### A.     Plaintiffs Lack Standing to Pursue Their APA and First Amendment Claims

To satisfy the "irreducible constitutional minimum of standing" and establish their right

to litigate their APA and First Amendment claims, Plaintiffs must show that:  (1) they have

"suffered an injury in fact"; (2) there is "a causal connection between the injury and the conduct

complained of"; and (3) it is "likely, as opposed to merely speculative, that the injury will be

redressed by a favorable decision."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)

(internal quotation marks omitted); see Alamo v. Clay, 137 F.3d 1366, 1369 (D.C. Cir. 1998);

see generally Newdow v. Bush, 391 F. Supp. 2d 95, 102 (D.D.C. 2005) ("Standing is a

requirement . . . that every litigant in a federal lawsuit must establish.").  Plaintiffs must "set

forth by affidavit or other evidence specific facts" establishing each of the above elements.

---

[5] Citations in the form "(Pls. Br. at __)" refer to the Memorandum of Points and
Authorities in Support of Plaintiffs' Amended Motion for Summary Judgment on Count One
("Plaintiffs' brief").

Lujan, 504 U.S. at 561 (internal quotation marks omitted); see Alamo, 137 F.3d at 1369 ("The burden rests on the plaintiff to 'allege specific, concrete facts [establishing standing].'").

Plaintiffs have failed to carry their burden with respect to standing. They have not shown—and cannot show—that they have suffered a cognizable injury as a result of the "push 5" requirement. Nor have they shown that it is likely (as opposed to merely speculative) that the injury about which they complain would be redressed by the elimination of the "push 5" requirement. Thus, Plaintiffs' APA and First Amendment claims must be rejected.

### 1.     Plaintiffs Cannot Establish an Injury In Fact

Plaintiffs' claim to injury is that the "push 5" requirement "deprive[s them] of the opportunity to communicate telephonically" with businesses (including the news media) and government entities (including courts) that "utilize . . . Automated Telephone Answering System[s] ('ATAS')."[6] (Pls. Br. at 2-3, 6.) However, that is not an injury sufficient to confer upon Plaintiffs standing to challenge the "push 5" requirement.

Plaintiffs are prisoners, and thus, their claim to injury must be evaluated in the proper context. As prisoners, Plaintiffs are required to forego "[m]any of the . . . privileges enjoyed by other citizens." Overton v. Bazzetta, 539 U.S. 126, 131 (2003). One of those privileges is unlimited and unconstrained telephone use. See, e.g., Perez v. Federal Bureau of Prisons, 229 Fed. Appx. 55, 57 (3d Cir. 2007) ("Prisoners have no right to unlimited telephone use." (internal quotation marks and brackets omitted)); Washington v. Reno, 35 F.3d 1093, 1100 (6th Cir. 1994)

---

[6] Plaintiffs also complain that the "push 5" requirement deprives them of their ability to "communicate telephonically" with friends and family members. However, this aspect of their claim deserves little attention. At most, the "push 5" requirement makes it so that Plaintiffs cannot leave messages on their friends' and family members' voicemail systems. In no way does the "push 5" requirement "deprive[] [Plaintiffs] of the opportunity to communicate telephonically" with their friends and family members. Plaintiffs certainly have provided no evidence to the contrary.

(same); Benzel v. Grammer, 869 F.2d 1105, 1109 (8th Cir. 1989) (same). To be sure, Plaintiffs retain the "right to communicate with persons outside [the] prison walls"; but, they do not retain the right to communicate by telephone with whomever they want whenever they want. Valdez v. Rosenbaum, 302 F.3d 1039, 1048 (9th Cir. 2002); see Pope v. Hightower, 101 F.3d 1382, 1384 (11th Cir. 1996). Use of a telephone is but one way Plaintiffs may exercise their right to communicate with non-inmates. See Valdez, 302 F.3d at 1048 ("Use of a telephone provides a means of exercising th[e] right [to communicate]." (emphasis in original)).

In light of the above, it is clear that Plaintiffs have not suffered a cognizable injury as a result of the "push 5" requirement. The "push 5" requirement merely limits Plaintiffs' ability to communicate by telephone with a small subset of the population—those businesses and government entities that can be contacted by telephone only through an ATAS.[7] It does not deprive Plaintiffs of their right to communicate with any individual or entity (government or otherwise) outside the prison walls. Plaintiffs may, for example, write letters to virtually anyone they want whenever they want. See Perez, 229 Fed. Appx. at 58 n.3 ("the telephone limitation . . . does not affect [plaintiff's] ability to communicate with people outside the prison through letter writing"); Israel v. Cohn, 6 Fed. Appx. 348, 350 (7th Cir. 2001) (observing that plaintiff "has alternative means [other than by telephone] of communicating with [persons outside the prison walls]"—"[h]e may write to them"). Plaintiffs' complaint that letter-writing is a less efficient means of communication than speaking by telephone (see Pls. Br. at 8-9; Sample Decl. ¶4)[8] is not well taken. The fact that Plaintiffs may, on occasion, have to resort to a less efficient means

---

[7] The "push 5" requirement does not limit Plaintiffs' ability to contact businesses and government entities that provide the public with multiple contact numbers, only one (or some) of which are answered by ATASs.

[8] Citations in the form "(Sample Decl. ¶__)" refer to the Declaration of Brandon Sample, which was submitted with Plaintiffs' brief.

of communication with respect to certain non-incarcerated persons or entities is one of "the ordinary incidents of prison life," Israel, 6 Fed. Appx. at 350; it does not produce an injury sufficient to confer standing.

Moreover, even if a prisoner's inability to communicate by telephone with certain businesses and government entities could constitute a cognizable injury (and, as explained above, it cannot), Plaintiffs have failed to "set forth by affidavit or other evidence specific facts" establishing that they were unable to communicate with any specific business or government entity as a result of the "push 5" requirement. See Lujan, 504 U.S. at 561 (emphasis added). Their allegations of injury are boilerplate:

- "I have attempted to make domestic prepaid calls . . . to clerks of court, businesses . . . , government agencies, and other called parties who utilize an [ATAS]. ATAS[s] are, however, incapable of pushing '5' to accept my calls. As a result, I have been deprived of the opportunity to communicate telephonically with domestic prepaid called parties who use an ATAS. As a result of this restriction, I have been unable to speak with officials from (1) the Dept. of Justice Inspector General's Office . . . ; (2) the Office of Management and Budget . . . ; and (3) the BOP's FOIA section." (Sample Decl. ¶3.)

- "I have attempted to make domestic prepaid calls . . . to clerks of court, businesses . . . , and other called parties who utilize an [ATAS]. ATAS[s] are, however, incapable of pushing '5' to accept my calls. As a result, I have been deprived of the opportunity to communicate telephonically with domestic prepaid called parties who use an ATAS. (Shaw Decl. ¶1.)[9]

To carry their burden, each Plaintiff would have to provide, at a minimum, the following information for each business and/or government entity that he was unable to contact telephonically: (1) the name of the business or government entity; (2) the date(s) that he tried

---

[9] Citations in the form "(Shaw Decl. ¶__)" refer to the Declaration of Bernard Shaw, which was submitted with Plaintiffs' brief.

but was unable to contact the business or government entity; and (3) the telephone number that he dialed.[10]

    2.    <u>Plaintiffs Cannot Establish that the Injury About Which They Complain Would Be Redressed by the Elimination of the "Push 5" Requirement</u>

Plaintiffs also lack standing to litigate their APA and First Amendment claims because they have failed to establish that if the "push 5" requirement were eliminated, they would "likely" be able to communicate by telephone with the businesses and government entities with whom they purportedly cannot now communicate telephonically.  <u>See</u> <u>Lujan</u>, 504 U.S. at 561 ("it must be likely, as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision'").  In the absence of the "push 5" requirement, individuals working at the businesses and government entities at issue could still decline to accept Plaintiffs' calls merely by hanging up the phone or by pushing "7."  (<u>See</u> Harrison Decl. ¶6.)  Thus, it is far from clear—and Plaintiffs certainly have not shown that it is "likely"—that, without the "push 5" requirement, Plaintiffs would be able to communicate by telephone with the businesses and government entities at issue.  <u>See</u> <u>Alamo</u>, 137 F.3d at 1369 (no standing where there is "a third-party causation problem").

**B.**    **The BOP Was Not Obligated to Engage in Notice-and-Comment Rulemaking Prior to Implementing the "Push 5" Requirement**

Because Plaintiffs lack standing to litigate their APA claim, this Court need not—and should not—reach the issue of whether the BOP was obligated to engage in notice-and-comment rulemaking prior to implementing the "push 5" requirement.  But, even if this Court were to

---

[10] To the extent there are <u>specific</u> businesses or government entities with which Plaintiffs would like to communicate telephonically (<u>see</u> Sample Decl. ¶3), they should submit an administrative remedy request to the BOP requesting that the BOP assist them in contacting those particular entities.  The BOP will then work with Plaintiffs to put them in contact with appropriate persons at those entities.

reach the merits of Plaintiffs' APA claim, it should find that the BOP was not obligated to engage in notice-and-comment rulemaking prior to enacting the "push 5" requirement. As demonstrated below, the BOP has been given broad discretion to manage the inmate telephone system, and its enactment of the "push 5" requirement was the result of its exercise of that discretion. As such, the BOP's decision to implement the "push 5" requirement cannot be second-guessed, and it certainly cannot be invalidated for having been enacted without notice-and-comment rulemaking. See 5 U.S.C. § 701(a) (judicial review is unavailable where agency action is "committed to agency discretion by law"); Harrison v. Federal Bureau of Prisons, 464 F. Supp. 2d 552, 557 (E.D. Va. 2006) (rejecting plaintiff's argument that the BOP had to engage in notice-and-comment rulemaking before increasing its long-distance telephone rate on the ground that "the BOP has broad discretion" with respect to "the provision of telephone services").

Congress has granted the BOP the authority to oversee the "management and regulation of all Federal penal and correctional institutions" and "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses." 18 U.S.C. § 4042. Pursuant to that broad grant of authority, the BOP has enacted regulations that address, inter alia, inmate telephone use. See 28 C.F.R. §§ 540.100-540.105. One of those regulations, 28 C.F.R. § 540.101, outlines certain aspects of the inmate telephone system. Another of those regulations, 28 C.F.R. § 540.100, gives the BOP (acting through its wardens) broad discretion to further limit inmate telephone use: "In addition to the procedures set forth in this subpart, inmate telephone use is subject to those limitations which the Warden determines are necessary to ensure the . . . good order . . . of the institution or to protect the public." Id. at § 540.100(a).

Recently, acting through its wardens and pursuant to the broad discretion granted to it by 18 U.S.C. § 4042 and 28 C.F.R. § 540.100(a), the BOP has modified the inmate telephone system to include the "push 5" requirement. (See Harrison Decl. ¶6.)  To be sure, the "push 5" requirement further limits the ability of inmates to communicate telephonically with certain non-inmates, i.e., those who can be contacted by telephone only through ATASs.  However, the "push 5" requirement was enacted for valid penological reasons, including to protect the public from unwanted and potentially harassing and/or threatening telephone contact with inmates and to preserve prison resources. (See id. at ¶¶6, 8-9.)  As such, the enactment of the "push 5" requirement:  (1) was an act well within the broad discretion granted to the BOP under 28 C.F.R. § 540.100(a) (providing the BOP with sweeping authority to implement policies that further limit inmate telephone use, so long as the policies are aimed at, inter alia, "protect[ing] the public" and promoting institutional "order"); and (2) is beyond APA challenge, see Harrison, 464 F. Supp. 2d at 557.  See generally Wolfish v. Levi, 573 F.2d 118, 125-26 (2d Cir. 1978) (finding that matters relating to "the provision of telephone services" to inmates are "'committed to agency discretion by law,'" and observing that "to require the [prison] to return to court whenever it seeks to make any change, however minor, in its telephone service, would . . . preempt the role of prison officials"), rev'd on other grounds by Bell v. Wolfish, 441 U.S. 520 (1979).[11]

---

[11] Plaintiffs argue that the BOP was required to engage in notice-and-comment rulemaking prior to enacting the "push 5" requirement because now that it has enacted the "push 5" requirement, it no longer provides written notice to individuals whose telephone numbers appear on inmates' official telephone lists. (See Pls. Br. at 4-5.)  However, the fact that the BOP no longer provides written notice to individuals whose telephone numbers appear on inmates' official telephone lists is irrelevant to whether the BOP was required to engage in notice-and-comment rulemaking prior to enacting the "push 5" requirement.  Because the BOP was not obligated to engage in notice-and-comment rulemaking prior to enacting the "push 5" requirement (for the reasons stated above), and because Plaintiffs' complaint challenges only the enactment of the "push 5" requirement (and not the BOP's decision to stop sending written

**C.      The "Push 5" Requirement Does Not Violate Plaintiffs' First Amendment Rights**

Throughout this litigation, Plaintiffs have argued that the "push 5" requirement violates their First Amendment rights. However, up until now, they have argued that the "push 5" requirement violates their First Amendment rights because it fails to satisfy the standard of review set forth in Turner v. Safley, 482 U.S. 78 (1987). (See, e.g., Docket No. 68.) In response, Defendants have argued persuasively that the "push 5" requirement meets the Turner standard. (See, e.g., Docket No. 72.) Now, in tacit recognition of the fact that the "push 5" requirement passes constitutional muster under the Turner standard, Plaintiffs assert that the "push 5" requirement is unconstitutional because it fails to satisfy the more exacting standard set forth in Procunier v. Martinez, 416 U.S. 396 (1974). This argument is unavailing. It is quite clearly Turner—not Procunier—that provides the appropriate standard of review. And, as Defendants have shown in their prior briefing (see, e.g., Docket No. 68) and reiterate below, the "push 5" requirement easily satisfies the Turner standard.[12]

1.      Turner Provides the Governing Standard for Plaintiffs' First Amendment Challenge to the "Push 5" Requirement

In Procunier, which was the Court's first significant decision regarding First Amendment rights in the prison context, the Court struck down prison regulations that censored certain

---

notice to individuals whose telephone numbers appear on inmates' official telephone lists), Plaintiffs' APA claim must be rejected.

Plaintiffs also argue that the BOP was obligated to engage in notice-and-comment rulemaking prior to enacting the "push 5" requirement because the "push 5" requirement places new limitations on their ability to communicate by telephone with non-inmates. (See Pls. Br. at 5-7.) This argument also fails. Because the enactment of the "push 5" requirement was an act committed to the BOP's discretion by law, see 28 C.F.R. § 540.100(a), it is beyond review, regardless of its consequences. See Harrison, 464 F. Supp. 2d at 557; see also Wolfish, 573 F.2d at 125-26.

[12] Of course, for the reasons stated above, Plaintiffs lack standing to litigate their constitutional challenge to the "push 5" requirement.

classes of statements in personal correspondence between inmates and non-inmates on the ground that the prison had failed to show that the regulations:  (1) furthered "an important or substantial government interest"; and (2) limited First Amendment freedoms "no greater than [was] necessary or essential" to promote that interest.  416 U.S. at 413-14.  Importantly, the Court based its decision in Procunier on the First Amendment rights of the non-inmates, and "expressly reserved the question of the proper standard of review to apply in cases involving questions of prisoner[] rights."  Turner, 482 U.S. at 85-86 (internal quotation marks omitted); see Procunier, 416 U.S. at 408-09.

In subsequent decisions where—as here—"prison regulation[s] impinge[d] on inmates' constitutional rights," the Court has declined to apply the Procunier standard.[13]  See Turner, 482 U.S. at 89; see also Thornburgh v. Abbott, 490 U.S. 401, 409 (1989).  Instead, in such "prisoner rights" cases, the Court has adhered to a standard that asks whether the challenged policy is "reasonably related to legitimate penological interests."  Turner, 482 U.S. at 89 ("If [prior Court cases] have not already resolved the question [left unresolved in Procunier], we resolve it now: when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.").  The Court has observed that "such a standard is necessary if prison administrators . . . , and not the courts, are to make the difficult judgments concerning institutional operations."[14]  Id. (internal quotation marks and brackets omitted).

---

[13] The instant case clearly involves a question of prisoner rights.  (See, e.g., Pls. Br. at 3 ("As a result [of the 'push 5' requirement], Plaintiffs have been deprived of the opportunity to communicate telephonically with domestic prepaid called parties who use an [ATAS].").

[14] Moreover, since deciding Procunier, the Court has made clear that the holding in that case (1) applies only to "outgoing [written] correspondence" by inmates to non-inmates, and (2) requires only that a challenged policy be 'generally necessary' to a legitimate governmental interest."  Thornburgh, 490 U.S. at 411 & n.10, 413 ("We do not believe that [Procunier] should,

Because the "push 5" requirement "impinge[s] on inmates' constitutional rights" and is the product of a "judgment[] concerning institutional operations," any challenge to its constitutionality must be reviewed under the <u>Turner</u> standard. This conclusion is consistent with the weight of authority. Indeed, all of the courts of which Defendants are aware that have addressed the merits of First Amendment challenges to prison policies affecting telephone use by inmates—including the Third, Seventh, Eighth, Ninth and Eleventh Circuits—have adjudicated those challenges under the <u>Turner</u> standard. <u>See, e.g.</u>, <u>Perez</u>, 229 Fed. Appx. at 57; <u>Valdez</u>, 302 F.3d at 1048-49; <u>Israel</u>, 6 Fed. Appx. at 350; <u>Pope</u>, 101 F.3d at 1384; <u>Benzel</u>, 869 F.2d at 1108; <u>Strandberg v. City of Helena</u>, 791 F.2d 744, 747 (9th Cir. 1986). Notably, Plaintiffs have cited no case in which a court used the <u>Procunier</u> standard to review a prison policy affecting telephone use.[15]

2.    <u>The "Push 5" Requirement is Constitutional Under the Turner Standard</u>

In determining whether a challenged prison policy—such as the "push 5" requirement— is "reasonably related to legitimate penological interests" (as <u>Turner</u> requires), courts are to consider four factors: (1) whether the policy has a rational connection to a legitimate penological interest; (2) whether there are alternative means open to inmates to exercise the asserted constitutional right; (3) whether the accommodation sought would have a negative impact on, <u>inter alia</u>, prison resources, non-inmates and other inmates; and (4) whether there are

---

or need, be read as subjecting the decisions of prison officials to a strict 'least restrictive means' test."). Thus, the <u>Procunier</u> standard applies only to a narrow class of cases, and even when it does apply, it does not subject the decisions of prison officials to a "strict 'least restrictive means' test." <u>Id.</u>

[15] Plaintiffs cite <u>Washington</u>, 35 F.3d at 1100 n.8, where the plaintiffs argued that the prison telephone policy at issue should be reviewed under the <u>Procunier</u> standard. Yet, the court in <u>Washington</u> found it "unnecessary" to reach that issue. <u>Id.</u> at 1100 n.8. It did, however, state at one point that "a prisoner's right to telephone access is 'subject to <u>rational limitations</u> in the face of <u>legitimate</u> security interests of the penal institution.'" <u>Id.</u> at 1100 (emphasis added).

ready alternatives to the policy.  See, e.g., Overton, 539 U.S. at 132, 135; Turner, 482 U.S. at 89-91; Kimberlin v. Dep't of Justice, 318 F.3d 228, 233 (D.C. Cir. 2003).  The first of the four Turner factors is the "most important."[16]  Kimberlin, 318 F.3d at 233.

Here, each of the four Turner factors favors a finding that the "push 5" requirement is constitutional:  (1) the "push 5" requirement is rationally related to legitimate penological interests—protecting the public from unwanted and potentially harassing and/or threatening contact with inmates and preserving prison resources; (2) Plaintiffs have alternative means (other than by telephone) of exercising their constitutional right to communicate with non-inmates (including non-inmates who work at businesses and government entities that utilize ATASs)—they can write letters; (3) the accommodation that Plaintiffs seek, i.e., the elimination of the "push 5" requirement, would have a negative impact on prison resources, non-inmates and other inmates; and (4) there are no ready alternatives to the "push 5" requirement.  Accordingly, this Court should find that the "push 5" requirement is constitutional and reject Plaintiffs' First Amendment claim.

        a.     *There is a rational connection between the "push 5" requirement and legitimate penological interests*

The "push 5" requirement is meant "to protect the public from unwanted and potentially harassing and threatening telephone contact with inmates."  (Harrison Decl. ¶6.)  Protecting the public from unwanted and potentially unpleasant contact with inmates is plainly a legitimate penological interest, see Pope, 101 F.3d at 1385 ("[r]eduction of . . . harassment qualifies as a

---

[16] As demonstrated below, here, each of the four Turner factors supports the conclusion that the "push 5" requirement is constitutional.  However, a prison policy may be constitutional even if each of the four factors does not favor a finding of constitutionality.  See Kimberlin, 318 F.3d at 233-34 (upholding a prison regulation where only three of the four Turner factors favored the government's position).

legitimate governmental objective"), and there is a rational connection between that interest and the "push 5" requirement.  Without the "push 5" requirement, an inmate could:

- leave harassing and/or threatening messages on voicemail systems[17]; and

- call any phone number that is answered by an automated switchboard, enter an individual's extension and speak with—and harass and/or threaten—that individual without anyone on the non-inmate's end of the line having consented to the call.[18]

(Harrison Decl. ¶8.)  Importantly, prior to the implementation of the "push 5" requirement, the BOP received numerous complaints each year of inmates (1) having left non-inmates inappropriate voicemail messages; and (2) having made inappropriate statements to individuals to whom they gained telephone access through automated switchboards.[19]  (Id.)  In light of the above, Plaintiffs' assertion that "the push '5' requirement has nothing to do with protecting the public from unwanted calls from inmates" (Pls. Br. at 8) is clearly false.

---

[17] Indeed, Plaintiffs acknowledge as much.  (See Sample Decl. ¶8 ("without the push '5' requirement," there is a "possibility" that inmates "would leave harassing or threatening messages on voicemail").)  Plaintiffs nevertheless argue that the "push 5" requirement is unnecessary (and should be struck down) because the BOP could deter such behavior by monitoring and recording all calls over the inmate telephone system.  (See id.)  However, before the enactment of the "push 5" requirement, the BOP monitored and recorded prisoner telephone calls, and still "received numerous complaints each year of inmates having left non-inmates inappropriate (and in some cases threatening) voicemail messages."  (Harrison Decl. ¶8.)  The "push 5" requirement is quite simply a more effective (and efficient) way of protecting the public against the receipt of harassing and/or threatening voicemail messages.

[18] Plaintiffs assert that the "push 5" requirement does not protect against the abuse of "'automated switchboards'" because even with the "push 5" requirement, Plaintiffs can call a number "answered by a switchboard . . . operator" and, "[a]fter the operator pushes '5,'" gain access to any extension.  (Sample Decl. ¶9 (emphasis added).)  However, Plaintiffs miss the point.  The "push 5" requirement is meant (in part) to protect against the abuse of automated switchboards.  Under the scenario posed by Plaintiffs, a live operator has knowingly accepted their call and agreed to transfer them to another extension.  This situation—where a live person knowingly accepts and transfers an inmate's call—is not a situation the "push 5" requirement is meant to address.  This situation is also (justifiably) of far less concern to prison officials than the one where an inmate gains telephone access to a non-inmate without any person on the non-inmate's end of the line having consented to the call.

[19] Thus, Plaintiffs' assertion that "no problems were caused by the absence of the push '5' requirement" (Sample Decl. ¶6) is incorrect.

The "push 5" requirement is also meant to—and does—preserve prison resources.  (<u>See</u> <u>id.</u> at ¶9.)  It is axiomatic that preserving prison resources is a legitimate penological interest. Prior to the implementation of the "push 5" requirement, to protect the public from unwanted prisoner telephone contact, the BOP would:  (1) notify in writing all persons whose numbers appeared on an inmate's official telephone list and who were neither part of the inmate's immediate family nor already on the inmate's approved visitor list; (2) provide each of those persons with the opportunity to have his or her number removed from the inmate's telephone list; and (3) keep track of, and effectuate, each such request.  (<u>See</u> <u>id.</u>); <u>see also</u> 28 C.F.R. § 540.101(a)(2).  Under that system, in a given year, the BOP would:  (1) mail out hundreds of thousands of letters notifying members of the public that their numbers had been placed on official telephone lists; and (2) process countless requests from members of the public to have their numbers removed from such lists.  (<u>See</u> Harrison Decl. ¶5.)  The "push 5" requirement has eliminated the need for the BOP to do any of the above.  (<u>See</u> <u>id.</u> at ¶7.)  It, thus, clearly preserves prison resources—it (1) saves the BOP the monetary costs associated with the

abovementioned mailings,[20] and (2) permits prison officials to allocate their scarce resources to

matters more pressing than telephone-related correspondence.[21]  (See id. at ¶9.)

<blockquote>
b.     <em>Plaintiffs have alternative means of exercising their First
Amendment right to communicate with non-inmates</em>
</blockquote>

As discussed above, Plaintiffs have a constitutional right to communicate with persons

outside the prison walls, but they do <u>not</u> have a constitutional right to communicate <u>by telephone</u>

with such persons.  See Valdez, 302 F.3d at 1048 ("We 'sensibly and expansively' define the

First Amendment right at issue in this case as the right to communicate with persons outside

prison walls.  Use of a telephone provides a <u>means</u> of exercising this right." (emphasis in

original)); Pope, 101 F.3d at 1385 (same).  Thus, the relevant question for purposes of this

Turner factor is whether Plaintiffs have means of communicating with non-inmates—including

---

[20] According to the BOP's declarant, the "costs of sending written notification to the public was . . . substantial when compared to the amount the [BOP now] pays for each [inmate telephone] call [with the 'push 5' requirement]."  (Harrison Decl. ¶9; see also id. at ¶6 ("The cost that the BOP bears as a result of the 'push 5' requirement is less than the aggregate cost for mailings under the prior system.").)  This is not at all surprising.  Inmates are permitted to regularly revise their official telephone lists.  (Id. at ¶9); see 28 C.F.R. § 540.101(b).  Thus, prior to the enactment of the "push 5" requirement, as a general matter, the BOP did <u>not</u> send out only a single wave of telephone-related correspondence with respect to each inmate's telephone list.  Rather, it often sent out multiple such waves.  (See Harrison Decl. ¶9.)  Indeed, each time an inmate revised his telephone list to include a new telephone number, there was the potential need for further telephone-related correspondence.  (See id.)  Plaintiffs are wrong to suggest that "the costs associated with the written notice procedure entail only a one-time postage cost of sending the notice and staff time to process letters from [that notice]."  (Sample Decl. ¶16.)

[21] Plaintiffs make much of the fact that the "push 5" requirement applies only to domestic calls, and not to international calls.  (See Pls. Br. at 8; Sample Decl. ¶¶5, 11.)  However, that fact is immaterial.  As an initial matter, the overwhelming majority of prisoner telephone calls are to domestic recipients.  (Harrison Decl. ¶11.)  Moreover, regardless of whether or not the "push 5" requirement is applied to international calls, it furthers legitimate government interests.  (See supra.)  And, the only reason that the "push 5" requirement is not applied to international calls is because it is not compatible with international telephone systems.  (Harrison Decl. ¶11.)  There is simply no good reason to force the BOP to eliminate the "push 5" requirement entirely merely because it does not apply to a small subset of prisoner telephone calls—international calls.  This is particularly true given that, as it is currently applied, the "push 5" requirement furthers legitimate government interests.  (See supra.)

24

the businesses and government entities at issue in this case—other than by telephone. The answer is clearly, "yes." The "push 5" requirement limits only Plaintiffs' ability to communicate by telephone. (See Sample Decl. ¶4 ("I retain the ability to communicate with government agencies via correspondence . . . .").) It does not affect Plaintiffs' ability to communicate with virtually anyone they want whenever they want through written correspondence.[22] See Pope, 101 F.3d at 1385 ("The undisputed evidence establishes that [plaintiff] had alternative means of exercising [his First Amendment] right because he could receive visitors and correspond with virtually anyone he wished. The availability of 'other avenues' suggests that we should be particularly conscious of the 'measure of judicial deference owed to correctional officials . . . in gauging the validity of the regulation.'").

c.   <em>Eliminating the "push 5" requirement would have a negative impact on prison resources, non-inmates and other inmates</em>

The elimination of the "push 5" requirement would have a negative impact on prison resources. If the "push 5" requirement were eliminated, then the BOP would again be forced to allocate human resources to telephone-related correspondence. (See Harrison Decl. ¶9 (observing that the "push 5" requirement has made it so that "those [prison officials who were] assigned to telephone-related correspondence may now be re-assigned to other duties").) The BOP would also again be forced to shoulder the monetary costs associated with telephone-related correspondence, including the costs of notifying non-inmates in writing of the fact that their telephone numbers have been placed on prisoner telephone lists and of their right to have their numbers removed from those lists. (See id.) See generally Overton, 539 U.S. at 135

---

[22] Plaintiff Sample's complaint that he "must wait months before receiving a response [to his correspondence], and [that] sometimes [he does] not receive a response at all" (Sample Decl. ¶4), is immaterial. "These inconveniences . . . are some of the ordinary incidents of prison life." Israel, 6 Fed. Appx. at 351.

(courts are "'particularly deferential' to prison administrators' regulatory judgments" when "[a]ccommodating [prisoner] demands would cause a significant reallocation of the prison system's financial resources").

The elimination of the "push 5" requirement would also have a negative impact on non-inmates. As discussed above, it would enable prisoners to (1) leave harassing and/or threatening messages on non-inmates' voicemail systems, and (2) initiate unexpected and unwanted contact with non-inmates through the use of automated switchboards. (See Harrison Decl. ¶8.)

Finally, the elimination of the "push 5" requirement would have a negative impact on other inmates. As stated above, the "push 5" requirement was enacted, in part, to address complaints by inmates about the pre-"push 5" telephone system—specifically, that inmates were charged for telephone calls that were answered by voicemail systems. (See id. at ¶10.) Thus, there are inmates who would unquestionably be opposed to the elimination of the "push 5" requirement.

d.    *There are no ready alternatives to the "push 5" requirement*

For there to be a ready alternative to the "push 5" requirement sufficient to tip the balance with respect to this Turner factor in Plaintiffs' favor, Plaintiffs would have to have "pointed to some obvious regulatory alternative that fully accommodates the[ir] asserted right while not imposing more than a de minimus cost to the [BOP's] valid penological goal[s]." Overton, 539 U.S. at 136; see Turner, 482 U.S. at 90-91. This is a "high standard," Overton, 539 U.S. at 136, which Plaintiffs here have failed to meet. See generally id. at 132 ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the

26

most appropriate means to accomplish them."); Benzel, 869 F.2d at 1108 ("federal courts owe great deference to the expertise of [prison] officials").

The alternatives to the "push 5" requirement that Plaintiffs have suggested would frustrate the BOP's valid penological goals of (1) "protect[ing] the public from unwanted and potentially harassing and threatening telephone contact with inmates" and (2) preserving prison resources.  (See Harrison Decl. ¶¶6, 8, 9.)  Plaintiffs would have the BOP eliminate the "push 5" requirement and replace it with:

- a system whereby an inmate's call would "connect automatically after the initial 'this call is from a federal prison' announcement" (the "first proposal"); or

- the BOP's pre-"push 5" system, whereby an inmate could call and gain immediate access to any number on his official telephone list (the "second proposal"); or

- a single, nationwide do-not-call registry similar to that presently used by the Federal Trade Commission (the "FTC") to address calls from telemarketers (the "third proposal").[23]

(See Pls. Br. at 8.)

The first two proposals would clearly frustrate the BOP's valid penological goals.  Under either proposal, an inmate would have access to voicemail systems and automated switchboards and could (1) leave members of the public harassing and/or threatening voicemail messages; and (2) use automated switchboards to directly contact—and harass and/or threaten—members of the public without anyone on the non-inmate's end of the line having consented to the call.[24]  (See Harrison Decl. ¶¶8, 14.)  Moreover, adopting either of the first two proposals would undermine the BOP's goal of preserving prison resources, as the BOP would have to return to its practice of notifying non-inmates in writing of the fact that their telephone numbers have been placed on

---

[23] See http://www.ftc.gov/donotcall.

[24] The fact that Plaintiffs may or may not abuse their telephone privileges in these ways is irrelevant.  "[P]rison officials may adopt and execute prophylactic policies to [serve valid penological goals]."  Israel, 6 Fed. Appx. at 350.

prisoner telephone lists and of permitting non-inmates to request that their numbers be removed from such lists.  (See id. at ¶13.)  Otherwise, non-inmates could be subjected to unexpected, unwanted and potentially harassing and/or threatening telephone and/or voicemail contact with inmates.

Notably, adopting either of the first two proposals would also be contrary to the expressed preference of many current BOP inmates.  (See id.)   Under either proposal, an inmate's telephone call would be connected and the inmate would be charged for the call regardless of whether the call was answered by a live person or a voicemail system.  (Id.)  As stated above, prior to the enactment of the "push 5" requirement, the BOP received numerous complaints from inmates who were charged for calls that were answered by voicemail systems. (Id. at ¶¶10, 13.)

Plaintiffs' third proposal—that the BOP replace the "push 5" requirement with a nationwide do-not-call registry akin to that used by the FTC to address calls from telemarketers—would also undermine the BOP's valid penological goals.  A nationwide do-not-call registry would leave those persons who have not (or have not yet) opted to have their telephone numbers added to the system subject to unexpected and inappropriate telephone and/or voicemail contact with inmates.  (See id. at ¶15.)  Adopting such a registry in lieu of the "push 5" requirement would place a meaningful burden on the BOP to notify members of the public about the existence of the registry prior to their receiving telephone calls from inmates.  (See id.)

In view of all of the above, the "push 5" requirement is clearly constitutional under the Turner standard.[25]

---

[25] As a final matter, even if the Procunier standard were the appropriate standard to apply (and as shown above, it is not), the "push 5" requirement would still be constitutional.  This is because the "push 5" requirement furthers legitimate government interests (e.g., protecting the

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that this Court DENY Plaintiffs' Amended Motion for Summary Judgment on Count One, GRANT Defendants' Cross-Motion for Summary Judgment on Count One and DISMISS Count One of Plaintiffs' Second Amended Complaint.

Dated: March 24, 2008                    Respectfully submitted,


                                          _____/s/_____
                                          JEFFREY A. TAYLOR, D.C. BAR # 498610
                                          United States Attorney


                                          _____/s/_____
                                          RUDOLPH CONTRERAS, D.C. BAR # 434122
                                          Assistant United States Attorney


                                          _____/s/_____
                                          CHRISTOPHER B. HARWOOD
                                          Assistant United States Attorney
                                          555 Fourth St., N.W.
                                          Washington, D.C.  20530
                                          Phone: (202) 307-0372
                                          Fax: (202) 514-8780
                                          Christopher.Harwood@usdoj.gov

**Of Counsel:**

Wanda Hunt, Esq.
Delaine Martin Hill, Esq.
Bureau of Prisons
Washington, D.C.

---

public from unwanted and potentially harassing contact with inmates and preserving prison resources), and is "generally necessary" to promote those interests.  See Thornburgh, 490 U.S. at 411 (observing that Procunier "required no more than that a challenged regulation be 'generally necessary' to a legitimate governmental interest").  Importantly, Plaintiffs have failed to point to a viable alternative to the "push 5" requirement.  In any event, to survive constitutional scrutiny under Procunier, a prison policy need not be the "'least restrictive means'" of promoting the identified government interest or interests.  Thornburgh, 490 U.S. at 411.

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2008, I caused a copy of the foregoing to be served via

first class prepaid postage as follows:

**BRANDON C. SAMPLE**
#33949-037
P.O. Box 9300
Texarkana, Texas 75505

**BERNARD SHAW**
#59469-004
FSL Jesup
2680 Highway 301 South
Jesup, Georgia 31599


                                              /s/
                                      Christopher B. Harwood