UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Brandon Sample, *et al.*, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>Bureau of Prisons, *et al.*, )<br>)<br>Defendants. )<br>_____ ) | Civil Action No. 06-cv-715 |

### March 24, 2008 DECLARATION OF DAWN HARRISON

I, Dawn Harrison, hereby declare and state the following:

1. I am currently employed by the Federal Bureau of Prisons of the United States Department of Justice as Acting Chief of the Inmate Telephone System Section. My business office is located at the Central Office in Washington, D.C. I have held this position since December 2007. I have been employed with the BOP since May 21, 1990.

2. In my current position, I am responsible for management and oversight of the inmate telephone system.

3. The statements in this declaration are based upon my personal knowledge, belief and experience, and upon information made available to me in the course of my official duties.

4. Prior to the implementation of the current inmate telephone system, each inmate was permitted to call only those numbers listed on the inmate's "official telephone list." 28 C.F.R. § 540.101(a). With limited exceptions, each inmate's official telephone list could include only 30 telephone numbers. An inmate was permitted to place a number on his official telephone

1

list so long as: (1) he certified that the number belonged to a person who was agreeable to receiving his calls, (2) he certified that any calls to the number would be made for a legitimate purpose, and (3) the warden did not have cause to preclude him from calling the number.

5. In a given year, the BOP maintained approximately 100,000 inmate telephone lists containing numbers of people, and entities, in the public whom inmates could contact. To protect the public from unwanted and unexpected telephone contact with inmates, the BOP would notify in writing each person whose telephone number appeared on an inmate's official telephone list and who was not (1) part of the inmate's immediate family or (2) on the inmate's approved visitor list. Each year, the BOP mailed out hundreds of thousands of written notifications informing those individuals that their numbers could be removed from a particular inmate's official telephone list if they sent a written request to that effect to the BOP. See 28 C.F.R. § 540.101(a)(2). Each year the BOP received—and had to effectuate—countless requests from members of the public to have their numbers removed from inmate telephone lists.

6. In 1998, acting pursuant to the authority granted to it by 18 U.S.C. § 4042 and 28 C.F.R. § 540.100(a), the BOP began modifying the inmate phone system and, among other changes, implemented the "Push 5" requirement. The "Push 5" requirement governs acceptance of incoming calls from inmates and the purpose of "Push 5" is to protect the public from unwanted and potentially harassing and threatening telephone contact with inmates. When an inmate makes a call, the call recipient is informed that the call is coming from a federal prison and the name of the inmate is provided. Call recipients are informed that the call is pre-paid and they will not be charged for the call. If the call recipient does not wish to accept the call he or she may hang up and the call will be disconnected. The only means of accepting a call from an

inmate is for the call recipient to push the number "5" on his or her telephone. The inmate will then be connected and the call will commence. To block future calls, the call recipient has the option of pushing the number 7 on his or her telephone. All future calls from the inmate will then be blocked. The BOP is charged a minimal cost until the call is accepted by the call recipient; at that time, inmates begin to be charged. The cost that the BOP bears as a result of the "push 5" requirement is less than the aggregate cost for mailings under the prior system.

7. As a general rule, inmates are still required to maintain a phone list of up to thirty people to whom calls are limited. However, under the current phone system, the BOP no longer mails written notifications to the public. The "push 5" requirement obviates the need for such notifications.

8. The BOP found that the previous telephone system contained problems that could, in part, be remedied by the implementation of the "Push 5" requirement. First, there were security concerns that threatened to hinder one of the agency's goals, the protection of the public. Previously, inmates had the capability to leave unwanted and potentially harassing and/or threatening messages on non-inmates' voice mail systems. Prior to the implementation of the "push 5" requirement, the BOP received numerous complaints each year of inmates having left non-inmates inappropriate (and in some cases threatening) voicemail messages. Inmates were also able to call any number that used an automated switchboard, enter a party's extension and then speak directly with (and potentially harass and/or threaten) that party without anyone on the non-inmate's end of the line having consented to the call. Prior to the enactment of the "push 5" requirement, the BOP received numerous complaints each year of inmates having made

3

inappropriate statements to individuals to whom they gained telephone access through automated switchboards.

9. The "push 5" requirement also helps to preserve prison resources. Under the old telephone system, to protect the public from unwanted telephone contact with inmates, prison officials would notify in writing persons whose telephone numbers appeared on an inmate's official telephone list (if they were neither part of the inmate's immediate family nor already on the inmate's approved visitor list) and keep track of, and effectuate, requests by those persons to have their numbers removed from official telephone lists. The costs of sending written notification to the public was, and would remain, substantial when compared to the amount the agency pays for each call until "Push 5" acceptance. Prior to the enactment of the "Push 5" requirement, the BOP would routinely send out multiple waves of telephone-related correspondence with respect to an inmate's telephone list (because each inmate was and is permitted to regularly revise his official telephone list). The "Push 5" requirement also successfully alleviated some of the prison staff's responsibilities as those assigned to telephone-related correspondence may now be re-assigned to other duties.

10. The "push 5" requirement was enacted, in part, as a response to inmate complaints regarding the previous telephone system. Under the previous system, inmates were charged for telephone calls when the calls were answered by voicemail systems and, each year, the BOP received numerous complaints from inmates regarding such telephone charges. The "push 5" requirement addresses those complaints as now inmates are charged only after a call recipient presses "5" and accepts the call.

4

11. The "push 5" requirement applies only to domestic calls, and not to international calls, as the system is not fully compatible with international telephone systems. However, the overwhelming majority of inmate telephone calls are to domestic recipients.

12. I am aware of Plaintiffs suggestion that the BOP eliminate the "push 5" requirement and replace it with: (1) a system whereby an inmate's call would "connect automatically after the initial 'this call is from a federal prison' announcement"; (2) the BOP's old system whereby an inmate could call and gain immediate access to each number on his official telephone list; and (3) a do-not-call registry.

13. Replacing the current telephone system with either of the first two proposals would undermine the BOP's goal of preserving prison resources, as either of the first two proposals would require a greater allocation of resources, as telephone-related correspondence would be required. Implementing either of the first two proposals would also be contrary to the expressed preference of many inmates. Under either of the first two proposals, if an inmate were to make a call to a telephone number that is answered by a voicemail system, the call would nevertheless be connected and the inmate would be charged for the call. Inmates have complained about this situation in the past. In fact, the "push 5" requirement was instituted, in part, to address such complaints.

14. Replacing the current telephone system with either of the first two proposals also would undermine the BOP's goal of protecting the public from unwanted and potentially harassing and/or threatening telephone contact with inmates. Under either proposal, an inmate would have easy access to voice mail systems and automated switchboards.

15. Plaintiff also suggests that the BOP implement a do-not call registry. However,

5

the system in place is akin to a do-not-call registry. Call recipients are given an option to press 7 and all calls from that inmate are blocked. The block can be lifted if the recipient contacts the prison and requests the change. A national do-not-call registry similar to that used by the Federal Trade Commission is not a realistic possibility. A BOP do-not-call registry would never generate the publicity to notify the general public to register in advance. Finally, and perhaps most importantly, the nationwide do-not-call registry would leave those persons who have not (or have not yet) opted to have their telephone numbers added to the system subject to unexpected and inappropriate telephone and/or voicemail contact with inmates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 24th day of March 2008 in Washington, D.C.

Dawn Harrison
Bureau of Prisons Trust Fund Branch